# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-11-00699-CV

**City of New Braunfels, Texas, Appellant**

**v.**

**Carowest Land, Ltd., Appellee**

## FROM THE DISTRICT COURT OF COMAL COUNTY, 433RD JUDICIAL DISTRICT
## NO. C2010-1519D, HONORABLE CHARLES R. RAMSAY, JUDGE PRESIDING

## O P I N I O N

The City of New Braunfels appeals a district court order denying a plea to the jurisdiction it has asserted in a suit brought against it by a local property owner, Carowest Land, Ltd. (Carowest).[1] We will affirm the district court's order in part and reverse in part.

## BACKGROUND

Although the rivers flowing through New Braunfels are renowned for their scenic beauty and sometimes-rowdy "tubers,"[2] they are also known to flood their surroundings periodically, and thus the City undertook the "South Tributary Regional Flood Control Project," or "South Tributary Project," a multi-million dollar public-works effort that entailed the construction of a large drainage channel to divert run-off waters into the Guadalupe River. To provide a portion

---

[1] *See* Tex. Civ. Prac. & Rem. Code § 51.014(a)(8).

[2] *See Stop the Ordinances Please v. City of New Braunfels*, 306 S.W.3d 919, 922 (Tex. App.—Austin 2010, no pet.).

of the drainage channel's route, appellee Carowest—a limited partnership associated with the Weston family—voluntarily conveyed to the City a strip of land (the Original Channel Tract) that traversed a tract of approximately 240 acres Carowest owned in the area. But there followed a succession of disputes between Carowest and the City, leading to the underlying litigation, which has been quite acrimonious at times. Although the parties advocate divergent views of these events, this appeal concerns only whether the district court possesses subject-matter jurisdiction to adjudicate the merits of the parties' claims, so we are to take as true the facts alleged by Carowest in its live pleadings or for which it has presented evidence except to the extent the City has presented evidence sufficient to negate those facts.[3] The following summary of relevant events accordingly reflects that analytical framework and the deference it requires to Carowest's side of the story.

According to Carowest, the origins of the parties' disputes lie in objections Carowest voiced to the City as early as 2008 regarding the configuration of the Original Channel Tract. The path of the Original Channel Tract bisected Carowest's 240-acre tract in a manner that severed approximately forty acres from the rest. Although there was evidence suggesting that its representatives had consented to this configuration or even specifically requested it, Carowest asked the City to agree to reroute the drainage channel to run instead along an outer boundary of the 240-acre tract, citing concerns with the larger tract's value and the well-being of Weston family members who resided there. A related concern, Carowest alleges, were indications from the City that it

---

[3] *See, e.g.*, *Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226-27 (Tex. 2004); *Creedmoor-Maha Water Supply Corp. v. Texas Comm'n on Envtl. Quality*, 307 S.W.3d 505, 516 (Tex. App.—Austin 2010, no pet.); *Hendee v. Dewhurst*, 228 S.W.3d 354, 366-69 (Tex. App.—Austin 2007, pet. denied); *see also University of Tex. v. Poindexter*, 306 S.W.3d 798, 806-07 (Tex. App.—Austin 2009, no pet.) (explaining differences in standards of review for evidence-based challenges to jurisdictional facts that implicate the merits versus those that do not).

had designs on acquiring the severed forty-acre portion of Carowest's property. Despite repeated requests by Carowest, the City refused to agree to relocate the Original Channel Tract. Ultimately, in March 2009, Carowest asked the City to rescind Carowest's conveyance of the Original Channel Tract altogether in exchange for Carowest paying any expenses caused by removing it from the South Tributary Project. The City refused this request as well.

Thereafter, Carowest alleges, the City, principally through its then-City Manager, Mike Morrison, "undertook a malicious campaign to harm Carowest." The campaign began, according to Carowest, with written notice in April 2009 that the City intended to condemn the severed forty-acre portion of Carowest's property for unspecified "public purposes," although subsequent correspondence from the City Attorney's office purported to "clarify" that the City was interested only in obtaining a few acres of it for a long-anticipated expansion of the municipal sewer plant. Next, in early May 2009, "despite urgent pleas from Carowest not to proceed," the City's contractor on the Project, YC Partners, Ltd. d/b/a Yantis Company (Yantis), allegedly at Morrison's direction, began excavating the drainage channel through the Original Channel Tract. Although Carowest acknowledges that it had previously conveyed the Original Channel Tract to the City, it alleges—and, indeed, there is undisputed evidence—that Carowest had a right to obtain, at its option, the dirt or fill that Yantis would dig up there and that Carowest had, in fact, indicated to the City that it wanted the fill.[4] Nevertheless, Carowest complains, Morrison instructed Yantis to transport the excavated fill to an undisclosed off-site location and to "offer zero information" to Carowest.

---

[4] As we will subsequently discuss, however, there is evidence that Carowest had not advised the City where Carowest wanted the fill delivered.

3

Around the same time, according to Carowest, Morrison advised the New Braunfels City Council, through the written agenda for the Council's May 11, 2009 meeting, that Carowest had "notified the [C]ity that they no longer wish to have the fill placed on their property." Carowest decries this representation as "false and made in bad faith," and one or more Carowest representatives responded by going to the May 11 Council meeting and "attempt[ing], in the interest of transparency, to provide the City Council with relevant information in open session." "[P]rompted by Morrison," Carowest alleges, "the Mayor literally 'pulled the plug' on the microphone of Carowest's representative when he attempted to publicly discuss these issues and to correct Morrison's false representations." Then, Carowest adds, the Council "improperly convened in closed executive session to deliberate the Carowest fill issue."

Following the Council meeting, Carowest claims, it "sent additional letters on May 12 and 14 requesting that digging cease and that fill no longer be removed from the Property," but the City nevertheless "continued and even accelerated excavation from May 11 to May 14." However, by May 15, the City relented, agreeing to temporarily stop excavation on the Original Channel Tract. By then, over 15,000 cubic yards of fill had been removed—according to Carowest, "enough to cover over 100 football fields with dirt an inch thick"—and valued by Carowest in excess of $100,000.

Thereafter, Carowest and the City negotiated and ultimately executed a June 27, 2009 letter agreement (Letter Agreement) "to resolve issues related to The South Tributary Project." The material terms of the Letter Agreement included the following:

- Carowest would provide a "professionally engineered design modification" to re-route the portion of the Project that crossed Carowest's 240-acre tract. Likewise, Carowest would be responsible for maintaining the modified channel after construction.

• Upon City approval of the modified design, the parties would work in good faith to execute documents effecting "a return of ownership of the current channel tract in exchange for the granting of a permanent easement for the modified channel tract to the City and other conveyances as provided for below."

• Carowest agreed to compensate the City for any difference in value between the Original Channel Tract and the modified one, and to pay for any engineering, permitting, review, and construction costs attributable to the modification exceeding those that the City would have incurred without the modification.

• Similarly, Carowest agreed to indemnify the City and hold it harmless for any claims brought by Yantis for any modification costs Yantis incurred, "such as delay costs claimed by Yantis and directly attributable to the Modification."

• Any fill generated from the South Tributary Project thereafter would be placed on Carowest's property, at the City's expense, within one-half mile of the source. Further, Carowest was afforded the option to obtain fill that would be generated by another anticipated City flood-control project known as the "North Tributary Project," including 13,944 cubic yards—"the amount represented by the City to be equal to the amount of fill removed from [the] Carowest Property"—that would be provided at no cost to Carowest.

• "In a spirit of cooperation, and to address and resolve prior discussions concerning possible condemnation of Carowest Property for NBU [New Braunfels Utilities] purposes," Carowest agreed to sell the City approximately six acres of Carowest property "primarily for use in a NBU future expansion," at a price to be determined through an appraisal process.

• Carowest agreed to donate to the City an easement near the modified channel route for use as a hike-and-bike trail.

Subsequently, to effectuate these terms of the Letter Agreement, Carowest and the City executed: (1) a September 2009 "Drainage Channel Development Agreement" whereby Carowest assumed control over channel construction on its property and the City agreed to make certain payments toward the construction; (2) a November 2009 "Drainage Channel Easement" granting the City the easement along the modified route of the drainage channel; (3) a November 2009 "Deed Without Warranty" (Deed) whereby Carowest conveyed to the City approximately five acres for the sole "purpose of expanding the existing sewage treatment facilities operated by New Braunfels Utilities

5

located adjacent . . . or other uses directly related to that purpose" (the NBU expansion tract); and (4) a November 2009 "Recreational Easement" permitting use of certain Carowest property as a hike-and-bike trail. Each of these agreements was expressly made in consideration for the parties' respective obligations under the Letter Agreement and incorporated that earlier contract in full.

The disputes between Carowest and the City would resume, however, with both sides accusing the other of materially breaching the Letter Agreement and the related contracts. Ultimately, the parties did not close on the City's acquisition of the NBU expansion tract—while the City would later accuse Carowest of refusing to accept payment for the tract, Carowest would allege that the City tried to change the terms of the deal—and Carowest purported to revoke both the Drainage Channel Easement and the Recreational Easement. A primary source of contention was a claim by Yantis against the City for approximately $550,000 it attributed to work delays on the portion of the South Tributary Project traversing Carowest's property. Invoking the City's right to indemnification under the Letter Agreement, Morrison and the City referred Yantis's claim to Carowest and demanded that it "work out a payment" with Yantis. Carowest denied that it was liable for any delays. Subsequently, in July 2010, Yantis re-submitted its delay claim to the City, this time seeking approximately $275,000. As before, Morrison and the City referred Yantis's claim to Carowest and demanded indemnification. Again, Carowest denied there had been any delays for which it was responsible.

Carowest alleges that Morrison and the City engaged in two sets of wrongful acts in regard to Yantis's delay claim. First, Carowest contends that Morrison knew all the while that Yantis's delay claim was "bogus" because, in Carowest's view, the claim had already been released or waived through an October 2009 change order, and would again be released by a May 2010

6

release obtained in connection with a progress payment. Despite knowing that the delay claim was meritless, Carowest adds, Morrison and the City "concealed" the existence of this change order and demanded indemnification despite the waivers as a continuation of their "malicious campaign to harm Carowest," causing Carowest to incur "substantial losses of time and resources" in addressing the claim. Second, Carowest alleges that the City ultimately resolved Yantis's delay claim through what Carowest characterizes as an unlawful quid-pro-quo arrangement—in May 2011, the City awarded Yantis the $5 million contract to construct the North Tributary Project (the anticipated public works project that was to be a source of fill to which Carowest was entitled under the Letter Agreement) contemporaneously with Yantis's release of the claim.

As these disputes were continuing to evolve, Carowest filed suit against the City and other defendants in November 2010. In the early stages of the litigation, Carowest sought only money damages based on the City's alleged breach of the Letter Agreement and Deed by failing to pay Carowest the purchase price of the NBU expansion tract, a declaratory judgment that the City had no right of indemnification from it under the Letter Agreement because Yantis had no valid delay claim,[5] and related attorney's fees.[6] The City asserted a plea to the jurisdiction seeking dismissal of these claims, which the district court denied. The City perfected an appeal of the district court's order, but later dismissed the appeal voluntarily.[7] Instead, contemporaneously with moving to dismiss its appeal, the City returned to district court and asserted counterclaims against

---

[5] *See generally* Uniform Declaratory Judgments Act (UDJA), Tex. Civ. Prac. & Rem. Code §§ 37.001-.011.

[6] *See id*. §§ 37.009 (UDJA's attorney's fees provision), 38.001(8) (authorizing award of attorney's fees in connection with a contract claim).

[7] *City of New Braunfels v. Carowest Land, Ltd.*, No. 03-11-00211-CV, 2011 Tex. App. LEXIS 5039 (Tex. App.—Austin July 1, 2011, no pet.) (mem. op.).

7

Carowest. As later amended, the counterclaims alleged that Carowest had materially breached the Letter Agreement and related contracts by refusing to accept payment for and close the conveyance of the NBU expansion tract and by purporting to revoke the Drainage Channel Easement and Recreational Easement. The City prayed for specific performance to compel Carowest "to close the sale on the NBU expansion tract" and for declarations that the revocations were null, void, and without effect on the two easements. In the alternative to this injunctive and declaratory relief, the City requested breach-of-contract damages for the amounts it had expended in fulfilling its contractual obligations to fund the drainage improvements on Carowest's property, which it alleged to be in excess of $840,000.

Carowest then amended its pleadings to add a number of new claims against the City for both money damages and declaratory relief, and it is this version of Carowest's pleadings that underlies this appeal. In them, Carowest asserts essentially three sets of claims for money damages:

- Carowest seeks to recover the value of the fill that was removed from the Original Channel Tract in May 2009, relying on theories of (1) inverse condemnation; (2) violations of constitutional equal protection and "substantive" due process guarantees, for which it seeks relief under 42 U.S.C. § 1983; and (3) common-law tort theories of conversion, fraud, conspiracy to commit both conversion and fraud, breach of fiduciary duty, and tortious interference with an alleged 2008 agreement between Carowest and Yantis.

- Carowest seeks to recover damages for the City's alleged breach of the Letter Agreement and related agreements, including the purchase price for the Deed (as it had sought in its earlier pleadings) as well as various construction and engineering expenses that Carowest contends the City was obligated to pay under the Letter Agreement and Drainage Channel Development Agreement but had failed to pay.

- Carowest seeks to recover the value of the "substantial losses of time and resources" that Carowest incurred in addressing the "bogus" Yantis delay claim, as well as various unspecified damages allegedly arising from the City's conduct after execution of the Letter Agreement. Carowest relies on theories of (1) equal protection and "substantive" due process violations "in subjecting Carowest to fraudulent, coercive, and bad faith treatment in connection with the Project," for which it seeks relief under Section 1983; and

8

(2) common-law tort theories of breach of fiduciary duty, fraud, and conspiracy to commit fraud.

Carowest also seeks exemplary damages based on its common-law tort theories, as well as attorney's fees incident to its breach-of-contract claims under chapter 38 of the Civil Practice and Remedies Code.[8]

As for its declaratory claims, Carowest seeks the following relief in addition to its original claim concerning indemnification for Yantis's delay claim:

- Declarations that the City violated the Texas Open Meetings Act[9] by (1) "refusing Carowest's request to discuss public issues and convening in closed session at the May 2009 Council Meeting"; and (2) "concealing the North Tributary Deal's quid pro quo arrangement between the City and Yantis from Carowest, the public and from other bidders on the North Tributary Project at the May 2011 Council Meeting."

- Declarations that the "North Tributary Deal" between the City and Yantis—i.e., the contract to construct the North Tributary Project, which Carowest alleges was awarded in exchange for Yantis's release of its delay claim—violates chapter 252 of the Local Government Code[10] and is, therefore, void.

In connection with its declaratory claims, Carowest also prays for attorney's fees under the UDJA.[11]

Subsequently, alleging that work was beginning on the North Tributary Project and insisting that it would be unable to exercise its option under the Letter Agreement to accept the project's "unique" and "valuable" fill before its legal challenges to Yantis's contract were adjudicated, Carowest filed an application for temporary restraining order (TRO) seeking to halt

---

[8] *See* Tex. Civ. Prac. & Rem. Code § 38.001(8).

[9] *See* Tex. Gov't Code § 551.142.

[10] *See generally* Tex. Loc. Gov't Code §§ 252.001-.063.

[11] *See* Tex. Civ. Prac. & Rem. Code § 37.009.

9

all work on the North Tributary Project. Around the same time, the City filed a second plea to the jurisdiction. Both sides presented evidence to the district court. A hearing was held on both the City's plea to the jurisdiction and Carowest's TRO request, at which the parties presented further evidence. Following the hearing, the district court denied both the plea to the jurisdiction and the TRO request by written order. The district court's order did not elaborate on its grounds or reasoning, nor were any findings of fact or conclusions of law requested or made. Seeking to challenge the district court's order denying its plea to the jurisdiction, the City perfected this appeal.[12]

## ANALYSIS

In what it styles as three issues on appeal, the City argues that the district court erred in denying its most recent plea to the jurisdiction.[13]

**Standard of review**

In addressing the City's jurisdictional challenges, simply put, we consider whether the facts Carowest presented in its live pleadings or evidence and not negated by evidence from the

---

[12]  *See id.* § 51.014(a)(8).

[13]  Carowest does not suggest that the City's earlier plea to the jurisdiction serves to limit our jurisdiction to review jurisdictional challenges raised in the City's current plea that reurge or overlap with challenges raised in its earlier plea. *Cf. City of Houston v. Estate of Jones*, 388 S.W.3d 663, 666-67 (Tex. 2012) (per curiam) (where jurisdictional challenges raised in subsequent plea to the jurisdiction entirely duplicated grounds raised in earlier plea, subsequent plea was substantively a motion for reconsideration of the earlier plea whose denial could not be appealed via section 51.014(a)(8) of the Civil Practice and Remedies Code). To the extent *Jones* raises any doubts in that regard, we conclude we possess jurisdiction over the entirety of the City's present appeal by virtue of its having perfected a timely appeal under section 51.014(a)(8) as to jurisdictional challenges not raised in its earlier plea and the rationale of *Rusk State Hospital v. Black*, 392 S.W.3d 88, 94-96 (Tex. 2012).

10

City would affirmatively establish the district court's subject-matter jurisdiction to adjudicate each of Carowest's claims.[14] That ultimate determination is a question of law that we review de novo.[15]

To invoke the district court's subject-matter jurisdiction in this case, Carowest's chief challenge is to avoid or overcome the City's governmental immunity. Governmental immunity is a common-law doctrine that derives from the sovereign immunity that shields the State, its agencies, and its officials.[16] It protects local government units, such as the City, when performing "governmental" functions, which are essentially those in which a unit is deemed to be acting as an arm of the State and in the interest of the general public.[17] The contemporary rationale for such immunity is that the Legislature, not the Judiciary, is best suited to make the policy-laden judgments as to how the resources of Texas governmental units should be expended.[18] To that end, such immunity deprives courts of subject-matter jurisdiction over suits brought against governmental units and their agents, as well as those seeking certain remedies deemed to independently implicate that

---

[14] *See, e.g.*, *Miranda*, 133 S.W.3d at 226-27; *Creedmoor-Maha*, 307 S.W.3d at 516; *Hendee*, 228 S.W.3d at 366-69; *see also Poindexter*, 306 S.W.3d at 806-07.

[15] *See Miranda*, 133 S.W.3d at 226.

[16] *See, e.g.*, *City of Houston v. Williams*, 353 S.W.3d 128, 134 (Tex. 2011); *Tooke v. City of Mexia*, 197 S.W.3d 325, 345 (Tex. 2006).

[17] *See City of Galveston v. State*, 217 S.W.3d 446, 469 (Tex. 2007); *Tooke*, 197 S.W.3d at 343 (citing *Dilley v. City of Houston*, 222 S.W.2d 992, 993 (Tex. 1949)). Given the relationship between the two doctrines, we cite a number of cases addressing *sovereign* immunity to support our analysis of *governmental* immunity without noting the distinction. Similarly, we will often refer to the two types of immunity interchangeably, or to either or both simply as "immunity."

[18] *Texas Dep't of Transp. v. Sefzik*, 355 S.W.3d 618, 621 (Tex. 2011) (citing *Texas Natural Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 854 (Tex. 2002)); *Tooke*, 197 S.W.3d at 331–32.

11

immunity, such as retrospective monetary relief,[19] unless the State has consented to suit through legislative waiver of that immunity.[20] A legislative waiver of immunity may be in the form of either statute or resolution, but in either case the Legislature's intent to waive immunity must be expressed in "clear and unambiguous language."[21]

Without question, Carowest's claims potentially implicate the City's governmental immunity—they are asserted against the City and, further, seek remedies that explicitly include money damages. Accordingly, Carowest has advanced, and the City has disputed, a litany of legal theories as to why Carowest's factual allegations, the evidence, or both affirmatively demonstrate that each of Carowest's claims either does not implicate the City's governmental immunity or comes within a statutory waiver of that immunity.

---

[19] *See Bacon v. Texas Historical Comm'n*, 411 S.W.3d 161, 173 (Tex. App.—Austin 2013, no pet.) ("This principle of judicial deference embodied in sovereign immunity extends not only to the Legislature's choices as to whether state funds should be spent on litigation and court judgments versus other priorities, but equally to the policy judgments embodied in the constitutional or statutory delegations that define the parameters of an officer's discretionary authority and the decisions the officer makes within the scope of that authority." (citing *Sefzik*, 355 S.W.3d at 621 (citing *W.D. Haden Co. v. Dodgen*, 308 S.W.2d 838, 839 (Tex. 1958)); *City of El Paso v. Heinrich*, 284 S.W.3d 366, 372 (Tex. 2009); *Director of Dep't of Agric. & Env't v. Printing Indus. Ass'n of Tex.,* 600 S.W.2d 264, 265 (Tex. 1980))).

Governmental immunity, like sovereign immunity, encompasses not only this immunity from suit, but also liability even if immunity from suit is waived. *Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d 371, 374 (Tex. 2006). Immunity from liability is an affirmative defense; it does not implicate the trial court's subject-matter jurisdiction, and is, therefore, not before us here. *See Miranda*, 133 S.W.3d at 224. Accordingly, we will, for convenience, generally use "governmental immunity" to refer solely to the City's immunity from suit.

[20] *Reata*, 197 S.W.3d at 375; *see also Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 695 (Tex. 2003) (noting that "Legislature is better suited to balance the conflicting policy issues associated with waiving immunity" (citing, among other cases, *IT-Davy*, 74 S.W.3d at 854)).

[21] *Bacon*, 411 S.W.3d at 173 (citing *IT-Davy*, 74 S.W.3d at 853-54 (citing *General Servs. Comm'n v. Little-Tex Insulation Co., Inc.*, 39 S.W.3d 591, 594 (Tex. 2001)) (quoting Tex. Gov't Code § 311.034; *University of Texas Med. Branch v. York*, 871 S.W.2d 175, 177 (Tex. 1994))).

**Constitutional claims**

We will begin with jurisdictional issues related to Carowest's constitutional claims, as they logically precede or supersede questions concerning the application and operation of governmental immunity—which, again, is a doctrine of Texas common law—and whether the Legislature has waived that immunity by statute.

### Inverse condemnation

As previously noted, Carowest seeks to recover the value of the fill that was removed from the Original Channel Tract in May 2009 under a theory of "inverse" condemnation, also termed a "takings" claim. Such claims are rooted in the takings clause of the Texas Constitution—article I, section 17—which provides, in relevant part, that "no person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person."[22] Article I, section 17 thus "requires that the government compensate the owner" whenever "private property is taken for a public purpose,"[23] and "when the government takes private property without paying for it" rather than initiating a formal condemnation proceeding, article I, section 17 authorizes the property owner to sue the government for compensation (hence the "inverse" condemnation and "takings" descriptors).[24] Because this cause of action is created by the Texas Constitution, a valid takings claim is not barred by common-law doctrines of sovereign

---

[22] Tex. Const. art. I, § 17.

[23] *El Dorado Land Co., L.P. v. City of McKinney*, 395 S.W.3d 798, 804 (Tex. 2013) (citing Tex. Const. art. I, § 17).

[24] *See id.*

and governmental immunity.[25]  Conversely, if a plaintiff "cannot establish a viable takings claim" against a governmental entity, the claim would implicate immunity and potentially be barred by it.[26]

"[I]t is fundamental that, to recover under the *constitutional takings* clause, one must first demonstrate an ownership interest in the property taken,"[27] and if one "does not own the disputed land, the takings claim is not viable and the trial court lacks jurisdiction."[28]  Carowest has not alleged or presented proof that it owned the Original Channel Tract at the time of the alleged "taking" of the fill from that property in May 2009—to the contrary, the evidence reflects, and Carowest acknowledges, that it had conveyed ownership of the Original Channel Tract to the City back in 2008.[29]  Nor is there any allegation, evidence, or assertion that Carowest reserved any ownership rights in the tract, or to the fill in particular, when making this conveyance.[30]  Rather, Carowest's theory, as it explains in its appellate brief, is that it "acquired its interest in the excavated soil via a contractual agreement."  It pleads:

---

[25]  *See State v. Holland*, 221 S.W.3d 639, 643 (Tex. 2007)*; Little-Tex*, 39 S.W.3d at 598.

[26]  *Texas Dep't of Transp. v. A.P.I. Pipe & Supply, LLC*, 397 S.W.3d 162, 166 (Tex. 2013) (citing *Hearts Bluff Game Ranch, Inc. v. State*, 381 S.W.3d 468, 491 (Tex. 2012)); *see Little-Tex*, 39 S.W.3d at 598.

[27]  *A.P.I. Pipe*, 397 S.W.3d at 166 (quoting *Texas Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 644 (Tex. 2004)) (emphasis in original).

[28]  *Id*. at 166-67.

[29]  The evidence includes the Letter Agreement, which contemplates "a return of ownership of the current channel tract to Carowest."  Similarly, Carowest acknowledges in its brief that, "[a]s the City correctly states in its brief, the City owned the land from which the dirt was removed." However, the evidence does not include any deed or other instrument effecting this conveyance.

[30]  *Cf. El Dorado*, 395 S.W.3d at 800-04 (viable takings claim predicated on reversionary interest reserved by claimant when conveying land); *State v. Brownlow*, 319 S.W.3d 649, 653-58 (Tex. 2010) (viable takings claim, to recover value of excavated fill, predicated on fee interest in land retained when granting easement).

14

The City and Carowest had previously agreed that Carowest would have the option to keep the fill from the drainage channel. Specifically, the City agreed to the following: "At Carowest's option, and at the City's cost, the fill material from the [Original] Channel Tract will be taken from the site by the City's contractor and transported by the City's contractor to any location requested by Carowest upon the Carowest Property or any location up to one-half mile outside the boundary of the Carowest Property."

Carowest further alleges that it had exercised its option to obtain the fill prior to May 2009, citing "an April 3, 2009 letter" in which "Morrison had personally acknowledged to Carowest [that] 'you have previously exercised your option via electronic mail that you want the fill material from the Channel Tract.'"

Although no agreement of the sort alleged by Carowest appears in the evidence,[31] the "April 3, 2009 letter" does. In it, Morrison, on behalf of the City, "respectfully declines" Carowest's request "that the right of way for the South Tributary Project that you voluntarily deeded to the City be rescinded and the property be deeded back to Carowest." Morrison then states:

The City intends to proceed under the terms of the agreement executed on December 4, 2008. Accordingly, since you have previously exercised your option by electronic mail that you want the fill material from the Channel Tract, please designate a specific location for the City to move the material. In addition, construction of the South Tributary project has already commenced. Construction on the Carowest property shall proceed immediately.

The record also includes an April 21, 2009 letter to Carowest from the New Braunfels City Attorney's office, which similarly advises:

---

[31] However, as we explain below, the evidence does contain references to the existence of an "agreement" or "contract" between the City, Carowest, and Yantis dated December 4, 2008.

15

The contractor on the [South Tributary] project is ready to begin work on the City's property (the "Channel Tract") that runs across the original Carowest tract. . . . Pursuant to the agreement between the City and Carowest, Carowest had elected to "accept the fill material from the channel tract" and that the contractor would transport it to a location on its property or up to one-half mile from its property. The contractor bid on the South Tributary Project with the assumption that Carowest would accept the fill material. The City and the contractor need to know if Carowest intends to honor its contractual commitment, and, if so, designate where it would like the fill material deposited. If not, the City has no other option but to instruct the contractor to remove the fill material from the site. It is estimated that the cost for removing the fill could be as much as $450,000, and the City will seek to recover those costs from Carowest since they will be incurred as a result of Carowest's breach of its contractual agreement with the City. The City believes that using the fill on the Carowest property will be a benefit to that property, and it will avoid the cost of hauling off the fill, but that is a decision to be made by [Carowest].

This evidence, which is undisputed, is significant for at least two reasons. First, it does not negate but supports Carowest's allegations that it had exercised its option and, therefore, owned any fill that would be excavated from the Original Channel Tract. The City does not advance any cogent reason why Carowest's ownership of the fill would not be the sort of property interest that could potentially give rise to a takings claim.[32] On the other hand, as the City points out, the same evidence negates one of the elements of a takings claim predicated on the City's removal or withholding of the fill.

To recover under article I, section 17 of the Texas Constitution, Carowest must plead and prove the following elements: (1) the City intentionally performed certain acts; (2) that resulted in a "taking" of the fill; (3) for public use.[33] A component of the intent element is that the

---

[32] Although Carowest characterizes the excavated fill as "personal property" rather than real property, *cf. Brownlow*, 319 S.W.3d at 653-58, compensable takings may involve both kinds of property. *See City of Dallas v. VSC, LLC*, 347 S.W.3d 231, 234-36 (Tex. 2011) (takings claim predicated on seizure of automobiles); *Steele v. City of Houston*, 603 S.W.2d 786, 789 (Tex. 1980) (takings claim predicated in part on destruction of personal belongings).

[33] *See Little-Tex*, 39 S.W.3d at 598-99.

16

City must have been acting in its capacity as sovereign—i.e., exercising eminent domain or police powers[34]—as opposed to acting "akin to a private citizen."[35] And with regard to rights voluntarily created by contract, such as we have here, "[t]he concept of a taking as a compensable claim theory has limited application."[36]

> Texas courts have long recognized that the State wears two hats: the State as a party to the contract and the State as sovereign. The State, in acting within a color of right to take or withhold property in a contractual situation, is acting akin to a private citizen and not under any sovereign powers. In this situation, the State does not have the intent to take under its eminent domain powers; the State only has an intent to act within the scope of the contract.[37]

Consequently, to establish the district court's jurisdiction over its takings claim, Carowest had to allege or present evidence of facts that would distinguish the City's removal or withholding of the fill as the exercise of sovereign powers, as opposed to the mere withholding of property or performance in a contract dispute in the manner that a private individual could.[38] The City argues that Carowest failed to do so. We agree.

The essence of Carowest's takings allegations is that the City removed large volumes of fill from the Original Channel Tract in derogation of Carowest's right—under a contract—to

---

[34] *See City of Dallas v. Stewart*, 361 S.W.3d 562, 569 (Tex. 2012); *Steele*, 603 S.W.2d at 789; *Texas Workforce Comm'n v. Midfirst Bank*, 40 S.W.3d 690, 697 (Tex. App.—Austin 2001, pet. denied).

[35] *Holland*, 221 S.W.3d at 643 (citing *Little-Tex*, 39 S.W.3d at 599).

[36] *Little-Tex*, 39 S.W.3d at 599 (quoting *Sun Oil v. United States*, 572 F.2d 786, 818 (Ct. Cl. 1978)).

[37] *Id*. (citations omitted).

[38] *See id*.; *MBP Corp. v. Board. of Trs. of Galveston Wharves*, 297 S.W.3d 483, 489-91 (Tex. App.—Houston [14th Dist.] 2009, no pet.).

receive it. Without more, Carowest, as the City suggests, has merely alleged facts that might support an ordinary breach-of-contract claim. Further, the evidence conclusively demonstrates that in the days immediately preceding the City's removal of the fill, the parties were locked in a dispute over whether Carowest was in breach of a contractual obligation to advise the City where it wanted the fill delivered. These facts establish that the City was merely asserting "its colorable contract rights" rather than its sovereign powers.[39]

In the face of this record, Carowest offers no persuasive reason for us to conclude that it has asserted, or could assert, a viable takings claim.[40] Accordingly, the district court erred in denying the City's plea to the jurisdiction as to this claim. And because the facts necessary to support a viable takings claim have been negated by Carowest's own pleadings and the evidence, Carowest is not entitled to an opportunity to replead.[41]

---

[39] *See Holland*, 221 S.W.3d at 643; *Little-Tex*, 39 S.W.3d at 599.

[40] Carowest insists that *Brownlow* presents "facts remarkably similar to those in this case"—specifically, a takings claim validated by the Texas Supreme Court that was rooted in "respective rights . . . derived from a contractual arrangement." To the contrary, *Brownlow* involved a takings claim asserted by the fee owner of land (a type of real property interest) that had been burdened by an easement (another type of real property interest) permitting the Texas Department of Transportation to build and maintain a mitigation pond. *See* 319 S.W.3d at 651-52. Further, the central issue in the case was whether the easement permitted TxDOT to take possession of fill excavated during the pond's construction for use on its highway projects elsewhere, and the supreme court held that it did not. *See id*. at 655. While *Brownlow* perhaps reflects the unsurprising notion that a property interest in excavated fill can serve as the basis for a takings claim, the court did not have cause to address the critical issue in the present case—whether the government was acting in its capacity as sovereign versus "akin to a private citizen" where rights have been voluntarily established by contract. That distinction, again, is controlled by the *Holland* and *Little-Tex* line of cases.

[41] *See Texas Parks & Wildlife Dep't v. Sawyer Trust*, 354 S.W.3d 384, 392 (Tex. 2011); *Texas A&M Univ. Sys. v. Koseoglu*, 233 S.W.3d 835, 839-40 (Tex. 2007).

18

*"Civil rights violations"*

In addition to its takings claim under the Texas Constitution, Carowest seeks to recover damages, including the value of the fill removed from the Original Channel Tract, through a claim under Section 1983[42] for the City's alleged "violation of the equal protection and substantive due process clauses of the Fourteenth Amendment of the United States Constitution."[43] Similar to Carowest's takings claim, governmental immunity would not bar viable Section 1983 claims against the City predicated on federal constitutional violations.[44]

However, as the City observes, Carowest's claims of federal constitutional violations are predicated largely on the same factual allegations that underlie its takings claim. In fact, in support of its Section 1983 claim, Carowest pleads that "[a]t all times relevant to this cause of action" the City "acted under color of state law in depriving Carowest of its fill by removing it from the Property." This is significant because (1) Texas takings jurisprudence is materially similar to federal takings jurisprudence;[45] and (2) under federal law, where claims nominally asserted under other constitutional provisions are based on what is substantively a takings claim, the former

---

[42] *See* 42 U.S.C. § 1983.

[43] U.S. Const. amend. XIV.

[44] *See Thomas v. Allen*, 837 S.W.2d 631, 632 (Tex. 1992) (explaining that state court may not refuse to entertain federal Section 1983 claim on ground that it is barred by sovereign immunity) (per curiam) (citing *Howlett v. Rose*, 496 U.S. 356, 369, 374 (1990)); *see also LTTS Charter Sch., Inc. v. C2 Constr., Inc.*, 358 S.W.3d 725, 738 (Tex. App.—Dallas 2001, pet. denied) (noting that local government entities do not enjoy immunity from suit under Section 1983).

[45] *Hearts Bluff Game Ranch, Inc.*, 381 S.W.3d at 477 ("We consider the federal and state takings claims together, as the analysis for both is complementary.").

19

are deemed to be "subsumed" into the takings claim, and are not independently actionable.[46] Consequently, the City contends that if Carowest's takings claim is not viable, then it follows that Carowest has failed to assert any viable "due process" or "equal protection" claim predicated on the same facts.

Carowest does not appear to dispute this conclusion, at least to the extent its "due process" or "equal protection" claims are predicated on deprivation of the fill. Instead, it insists that these claims are not, *in their entirety*, based on the same facts and do not implicate the same constitutional protections as its takings claim. Indeed, Carowest complains more broadly of "fraudulent, coercive, and bad faith treatment in connection with the [South Tributary] Project." Liberally construing Carowest's pleadings, as we must do,[47] these allegations would appear to reference purported conduct by the City beyond deprivation of the fill, such as its alleged acts in connection with the Yantis delay claim.

On the other hand, these other factual allegations, while potentially sounding in the common-law tort theories Carowest advances, would fall short of demonstrating any actions by the City infringing on any constitutionally protected interest or amounting to constitutionally cognizable unequal treatment.[48] In short, Carowest has not alleged any viable claim for constitutional violations

---

[46] *See Sandy Creek Investors, Ltd. v. City of Jonestown*, 325 F.3d 623, 626 (5th Cir. 2003); *John Corp. v. City of Houston*, 214 F.3d 573, 582-83 (5th Cir. 2000).

[47] *See Miranda*, 133 S.W.3d at 226.

[48] *See Liberty Mut. Ins. Co. v. Texas Dep't of Ins.*, 187 S.W.3d 808, 827 (Tex. App.—Austin 2006, pet. denied) ("[I]n order to bring a substantive due process claim, an individual must show they have a protected interest."); *John Corp.*, 214 F.3d at 577 ("The Equal Protection Clause protects individuals from governmental action that works to treat similarly situated individuals differently") (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)); *see also Ex parte Morales*, 212 S.W.3d 483, 500 (Tex. App.—Austin 2006, pet. ref'd) (explaining that equal protection clause requires that "'all persons similarly situated shall be treated alike' under the law").

that is substantively distinct from its non-viable takings claim. Consequently, the district court erred in denying the City's plea to the jurisdiction as to Carowest's claim under Section 1983. However, while Carowest's pleadings regarding its Section 1983 claim are currently insufficient to invoke the district court's subject-matter jurisdiction, we also conclude that its pleadings do not affirmatively negate jurisdiction either, nor has the City argued or otherwise suggested that Carowest has already had sufficient opportunity to amend its pleadings to correct the jurisdictional defect. Consequently, upon remand, Carowest is entitled to a reasonable opportunity to amend its pleadings to attempt to cure the jurisdictional defect.[49]

**Common-law monetary claims**

We now turn to whether Carowest's common-law contract and tort claims implicate the City's governmental immunity or come within a waiver of it.

### *"Proprietary" vs. "governmental" functions*

As previously noted, governmental immunity is a derivative of the State's sovereign immunity that shields local governmental units, including municipalities, when performing "governmental" functions, those in which a unit is deemed to be acting on behalf of the State and the general public.[50] The converse of the "governmental" functions that are shielded by governmental

---

Furthermore, to establish municipal liability under Section 1983, a plaintiff must show that the municipality acted pursuant to an official policy or custom and that this action caused a violation of a particular constitutional right. *Valle v. City of Houston*, 613 F.3d 536, 541 (5th Cir. 2010) (citing *Monell v. Department of Soc. Servs.*, 436 U.S. 658, 691 (1978)).

[49] *See Miranda*, 133 S.W.3d at 226-27.

[50] *See City of Galveston*, 217 S.W.3d at 469; *Tooke*, 197 S.W.3d at 343 (citing *Dilley*, 222 S.W.2d at 993).

21

immunity are "proprietary" functions, which, generally speaking, are those in which a municipality is deemed to be acting in its "'private capacity, for the benefit only of those within its corporate limits, and not as an arm of the government.'"[51] As one of the jurisdictional bases for its claims, Carowest has asserted that "[t]he City's tortious conduct was committed while it was engaged in proprietary, rather than governmental, functions," such that governmental immunity does not shield the City from Carowest's claims arising from that conduct.[52]

Although the distinction is rooted in the common law, the Texas Constitution has authorized the Legislature to "define for all purposes those functions of a municipality that are to be considered governmental and those that are proprietary, including reclassifying a function's

---

[51] *Tooke*, 197 S.W.3d at 343 (quoting *Dilley*, 222 S.W.2d at 993).

[52] In these pleading allegations, as well as on appeal, Carowest appears to rely on the "proprietary functions" classification solely to establish jurisdiction as to its tort claims, not its breach-of-contract claims. *Cf. Tooke*, 197 S.W.3d at 33 (Texas Supreme Court observing that while "[t]he proprietary-governmental dichotomy has been used to determine a municipality's [governmental] immunity from suit for tortious conduct . . . we have never held that this same distinction determines whether immunity from suit is waived for breach of contract claims, and we need not determine that issue here."). To the extent Carowest seeks to extend this analysis more broadly, we note that the Texas Supreme Court has assumed without deciding that if the proprietary-governmental dichotomy applies beyond tort claims (i.e., to claims not directly governed by the Tort Claims Act), courts should nonetheless defer to the Act's classifications of proprietary-versus-governmental functions (discussed below) in applying the dichotomy as a matter of the common law. *See id*. at 343-44 (looking to Act's classification scheme to determine whether breach-of-contract claim implicated a municipality's proprietary or governmental functions, as "we see no reason to think that the classification would be different under the common law."); *accord PKG Contracting, Inc. v. City of Mesquite*, 197 S.W.3d 388, 388-89 (Tex. 2006) (per curiam) (similarly deferring to Tort Claims Act's classification scheme in determining that breach-of-contract claims implicated municipality's governmental rather than proprietary functions). As in *Tooke* and *PKG Contracting*, Carowest has suggested no reason why the proprietary-governmental classification would apply any differently to its contract claims versus its tort claims, nor can we conceive of any. Accordingly, to the extent Carowest is relying on the "proprietary functions" distinction to establish jurisdiction over its contract claims and not merely its tort claims, our analysis is the same.

22

classification assigned under prior statute or common law,"[53] and the Legislature has done so in the Tort Claims Act. In section 101.0215 of the Act, the Legislature has provided a non-exclusive list of municipal functions and activities that are deemed to be "governmental" functions and not "proprietary" functions.[54] As the City emphasizes, these examples include "sanitary and storm sewers," "dams and reservoirs," "health and sanitation services," "water and sewer service," "waterworks," "engineering functions," "parks and zoos," and "recreational facilities, including but not limited to swimming pools, beaches, and marinas."[55]

The City urges that Carowest's claims concern City functions that are in the same basic nature and character as these "governmental" functions identified in the Tort Claims Act, namely, the City's alleged actions in connection with its provision of a new flood-control project, wastewater treatment plant expansion, and recreational facilities. We agree. In fact, Carowest does not directly dispute the City's assertions. Instead, Carowest insists that the City has made an "implied judicial admission" that Carowest's claims implicate "proprietary" functions. As support, Carowest points to arguments advanced by the City in regard to Carowest's takings claim. In that context, the City, as previously discussed, invoked the principle that an actionable taking must be predicated on a governmental entity's exercise of its sovereign power in acquiring or withholding property, as opposed to the entity's acquisition or enforcement of such rights "in the same manner as a private citizen," such as by contract. Carowest's arguments are without merit.

---

[53] Tex. Const. art. XI, § 13.

[54] *See* Tex. Civ. Prac. & Rem. Code § 101.0215(a), (c).

[55] *Id*. § 101.0215(a)(2), (9), (11), (13), (19), (23), (30), (32).

For one thing, Carowest conflates two distinct and independent legal concepts—(1) whether the City has exercised sovereign power (i.e., eminent domain or police power) as opposed to acting "in the same manner as a private citizen" in acquiring or withholding property, for purposes of determining whether a taking actionable under article I, section 17 of the Texas Constitution has occurred, and (2) whether the City was performing governmental or proprietary functions, which goes to whether governmental immunity shields the City when performing those functions as a matter of Texas common law. Carowest reasons, in essence, that the parameters of sovereign power for purposes of takings analysis is coextensive with the parameters of governmental functions shielded by governmental immunity. To demonstrate the fallacy in Carowest's reasoning, we need only observe that municipalities routinely enter into contracts to perform governmental functions, such that a municipality would be deemed to be acting in its governmental capacity and thus be shielded by governmental immunity.[56] In any event, any supposed "admission" by the City that it was engaged in proprietary rather than governmental functions would not control the scope of governmental immunity here, as this is a question of subject-matter jurisdiction and, accordingly, cannot be waived or conferred by agreement.[57]

In short, the "implied judicial admission" on which Carowest relies is not material to, much less dispositive of, whether its claims implicate the City's proprietary versus governmental functions. We agree with the City that Carowest has not asserted claims predicated on anything but governmental functions.

---

[56] *See, e.g.*, *PKG Contracting, Inc.*, 197 S.W.3d at 389 ("[W]e conclude that the City was acting in its governmental capacity when it contracted with [contractor] to construct a storm drainage system.").

[57] *Rusk*, 392 S.W.3d at 95; *Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 445 (Tex. 1993).

24

### *"Waiver" of immunity through the City's own actions*

Carowest has also asserted that the City wholly or partly "waived" its own governmental immunity in three ways: (1) by "expressly consenting to suit and liability" in the Deed and the Drainage Tract Development Agreement;[58] (2) through "egregious conduct" constituting "waiver by conduct"; and (3) by asserting affirmative claims for relief against Carowest. Carowest's notion that the City can unilaterally waive its governmental immunity through its own actions traces back to the Texas Supreme Court's now-infamous footnote in *Federal Sign v. Texas Southern University* intimating that "[T]here may be . . . circumstances where the State may waive its immunity by conduct other than simply executing a contract so that it is not always immune from suit when it contracts."[59] But in the years since it decided *Federal Sign*, the high court has clarified—and repeatedly emphasized—that it defers to the Legislature, not the actions of individual governmental units, to determine whether, when, and how sovereign or governmental immunity should be waived.[60] In so doing, moreover, it has squarely rejected the notion that a governmental

---

[58] Specifically, Carowest points to the following language in the Deed:

> [T]his Deed is valid and enforceable in a court of law and . . . both parties [i.e., Carowest and the City] are (a) subject to the jurisdiction of the court and (b) subject to suit and liability hereon.

It relies on the following language in the Development Agreement:

> [T]his Agreement is valid and enforceable in a court of law and that both parties [Carowest and the City] are (a) subject to the jurisdiction of the court, (b) subject to suit and liability hereon, and (c) have the right to any money damages and/or legal, equitable and/or other contract rights they have in the event of the other party's default [except for] punitive damages . . . .

[59] 951 S.W.2d 401, 408 n.1 (Tex. 1997).

[60] *See, e.g.*, *City of Dallas v. Albert*, 354 S.W.3d 368, 373-74, 379-80 (Tex. 2011); *City of Galveston*, 217 S.W.3d at 471; *see also Reata*, 197 S.W.3d at 374-75 (observing that "there is

25

entity with authority to enter contracts, or an agent acting on its behalf, can contractually waive immunity from suit, as Carowest insists occurred here.[61] It has similarly declined repeated requests to recognize a "waiver by conduct,"[62] and has never gone further than its suggestion in *Federal Sign* that such a waiver *might* conceivably occur under some set of facts it has not yet seen. Similarly, in the absence of further guidance from the supreme court, this Court (at least in recent years) has consistently rejected requests that we recognize "waivers by conduct" under a variety of factual scenarios.[63]

If this notion of "waiver" of immunity "by conduct" has any current viability, it has lived on within the rubric not of whether sovereign or governmental immunity has been waived, per se, but in the threshold determination of whether immunity applies in the first place. Although it defers to the Legislature to determine when and how immunity should be *waived*, the Texas Supreme Court has explained that the applicability and parameters of immunity *in the first*

___

tension between the concept of a governmental entity *waiving* its immunity from suit by some action independent from the Legislature's waiving immunity and the principle that only the Legislature can waive sovereign immunity . . . [and] tension between the concept of a governmental entity waiving its immunity from suit and the principle that a court's lack of subject-matter jurisdiction generally cannot be waived." (citing *Federal Underwriters Exch. v. Pugh*, 174 S.W.2d 598, 600 (Tex. 1943); *IT-Davy*, 74 S.W.3d at 853)).

[61] *See IT-Davy*, 74 S.W.3d at 857-58.

[62] *See, e.g.*, *Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 414 (Tex. 2011); *Koseoglu*, 233 S.W.3d at 840; *Catalina Dev., Inc. v. County of El Paso*, 121 S.W.3d 704, 706 (Tex. 2003); *IT-Davy*, 74 S.W.3d at 857 ("Creating a waiver-by-conduct exception would force the State to expend its resources to litigate the waiver-by-conduct issue before enjoying sovereign immunity's protections—and this would defeat many of the doctrine's underlying policies.").

[63] *See, e.g.*, *Employees Retirement Sys. of Tex. v. Putnam, LLC*, 294 S.W.3d 309, 327 (Tex. App.—Austin 2009, no pet.); *Smith v. Lutz*, 149 S.W.3d 752, 761 (Tex. App.—Austin 2004, no pet.).

*instance* remain a matter of the common law and, thus, squarely within judicial rather than legislative prerogatives.[64] Consistent with these principles, the Texas Supreme Court has come to analyze so-called "waiver-by-conduct" issues as factors in an analysis of whether it should alter, as a matter of the common law, the contours or boundaries of immunity in particular situations.[65]

Only one of Carowest's theories of "waiver" or avoidance of governmental immunity based on the City's unilateral actions implicates a common-law modification or abrogation of immunity heretofore recognized by the Texas Supreme Court. That lone theory is Carowest's assertion that governmental immunity does not bar its contract and tort claims because the City has asserted its own affirmative claims for relief. In instances where a "governmental entity has joined into the litigation process by asserting its own affirmative claims for monetary relief," the Texas Supreme Court has explained, the entity "leave[s] its sphere of immunity from suit" with respect to monetary claims against it, asserted as offsets, that are "germane to, connected with, and properly defensive to" its affirmative claims.[66] The supreme court has reasoned that such a claim against a governmental entity would not implicate the fiscal concerns underlying the immunity doctrines, considering that "the governmental entity . . . will presumably have made a decision to expend resources to pay litigation costs" and that any recovery would merely offset the entity's

---

[64] *See Albert*, 354 S.W.3d at 374 ("[W]e have not . . . altered the principles that (1) the boundaries of sovereign immunity are determined by the judiciary, and (2) waivers of sovereign immunity . . . must generally be found in actions of the Legislature." (citing *City of Galveston*, 217 S.W.3d at 468, 471)).

[65] *See id*. at 374 (explaining that "prior decisions . . . including [*Catalina Dev., Inc.*, 121 S.W.3d at 705-06], in which we discussed the possibility that a governmental entity might waive its immunity by conduct," addressed a limited *abrogation* of "the common law doctrine of governmental immunity") (emphasis added).

[66] *Reata*, 197 S.W.3d at 376-77.

27

recovery and not impact the "tax resources . . . [or] fiscal planning of the governmental entity."[67]

As further justification, the court has added that "it would be fundamentally unfair to allow [the] governmental entity to assert affirmative claims against a party while claiming it had immunity as to the party's claims against it."[68] But this modification of immunity and its underlying rationales, the supreme court has emphasized, do not extend to claims for damages in excess of the amount necessary to offset the governmental entity's recovery,[69] nor to claims that are *not* "germane to, connected with, and properly defensive to those asserted by the governmental entity," and the governmental entity remains shielded by immunity to that extent.[70]

The City disputes that this jurisdictional theory has any application here. It first argues that Carowest failed to properly raise the theory because it did not explicitly plead it in its live petition. However, the City's arguments rest on authority involving statutory waivers of immunity, and whatever merit the City's argument might have in that context, the issue here is instead the substantive scope of immunity in the first instance.[71] In any event, facts, not recitations of legal conclusions, are what matters in determining whether Carowest has invoked the district court's

---

[67] *Id*. at 375.

[68] *Id*. at 375-76.

[69] *See id*. at 376-77.

[70] *See City of Irving v. Inform Constr., Inc.*, 201 S.W.3d 693, 693-94 (Tex. 2006) (per curiam).

[71] The City relies on *Texas Department of Transportation v. Jones*, 8 S.W.3d 636 (Tex. 1999) (per curiam), which involved a claim asserted under the Tort Claims Act. We note that *Jones* concerned not the sufficiency of the claimant's pleadings of the statutory waiver, but whether the court of appeals had erred in holding that sovereign immunity was not a jurisdictional bar to suit that could be raised through a plea to the jurisdiction. *See id*. at 637-39.

28

subject-matter jurisdiction,[72] and the fact that the City had asserted claims for affirmative relief is conclusively established by the copy of its live counterclaims that appears in the clerk's record.[73] We reject, in other words, the City's notion that Carowest cannot rely on this jurisdictional theory because Carowest did not file a pleading reciting that the City had filed a pleading asserting its affirmative claims.

Similarly, the City suggests that the timing of the parties' respective claims has some impact on the application of this jurisdictional theory, emphasizing that Carowest filed some of its monetary claims after the City filed its counterclaims. The Texas Supreme Court has squarely rejected that notion.[74] The City further argues that its counterclaims do not implicate this jurisdictional theory because (1) the theory operates only when a governmental entity asserts claims for money damages, and (2) although the City asserted a counterclaim for money damages, that claim is styled as an alternative to the City's claims for specific enforcement of the Deed and declaratory claims regarding the legal status of the Recreational Easement and the Drainage Channel Easement. The City is correct to the extent the Texas Supreme Court, to date, has not extended this jurisdictional theory to governmental claims seeking declaratory or equitable relief, as opposed

---

[72] *See Bacon*, 411 S.W.3d at 171; *Creedmoor-Maha*, 307 S.W.3d at 513, 516 & n.8.

[73] *See Texas Real Estate Comm'n v. Nagle*, 767 S.W.2d 691, 694 (Tex. 1989) (explaining that court can take judicial notice of its own file).

[74] *See Inform Constr., Inc.*, 201 S.W.3d at 694 (governmental unit's affirmative claims were in form of a counterclaim, and whether counterclaim was compulsory or permissive did not impact the analysis); *Reata*, 197 S.W.3d at 377 (affirmative claims were in form of intervention; noting that "we see no substantive difference between a decision by the City to file an original suit and the City's decision to file its claim as an intervenor").

to monetary relief.[75]  But it remains that the City *did* assert a claim seeking affirmative monetary relief—over $840,000 in damages, in fact—based on Carowest's alleged breach of the Letter Agreement and related agreements.  In so doing, the City has left its "sphere of immunity from suit" to the extent of offsetting claims by Carowest that are "germane to, connected with, and properly defensive" to the City's monetary claim.  The fact that the City asserts its monetary claim in the alternative is relevant to, at most, whether the City will ultimately recover under that claim as the litigation progresses.  If the City ultimately does not recover on its monetary claim because it elects its declaratory or equitable remedy instead (or, for that matter, because it nonsuits the claim or the district court rules adversely on it), the effect, as the Texas Supreme Court has explained, would merely be that Carowest "could not prevail on [its] claims because [it] could not recover a judgment for damages," as there would be no monetary award to the City against which Carowest's award could be offset.[76]  It is thus an issue that goes to the *merits* of Carowest's offsetting claims, and does not alter the scope of the district court's limited *jurisdiction* to adjudicate those claims that arises by virtue of the City's assertion of its monetary claim.[77]

---

[75]  *See Sharyland*, 354 S.W.3d at 413-14 (assuming without deciding that immunity would not bar offset claims against governmental entity based on declaratory counterclaim that would have the effect of rescinding conveyance of property, and deciding claims on different ground); *but see Manbeck v. Austin Indep. Sch. Dist.*, 381 S.W.3d 528, 532-33 (Tex. 2012) (holding that principle did not apply to governmental entity's suit for judicial review from workers' compensation decision; observing that entity "never brought an affirmative claim for money damages against which [the private litigant's] claims could be offset.").

[76]  *Albert*, 354 S.W.3d at 376.

[77]  *See id.*; *see also Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000) (emphasizing that courts deciding pleas to the jurisdiction should not unnecessarily delve into the merits).  Similarly inapposite is considerable briefing the City devotes to attacking the merits of each of Carowest's common-law tort claims.

The controlling inquiry, in other words, boils down solely to whether Carowest's breach-of-contract and common-law tort claims are "germane to, connected with, and properly defensive" to the City's monetary claim, so as to fall within the district court's limited jurisdiction to adjudicate such claims to the extent of offsetting any recovery by the City. The Texas Supreme Court has equated "germane to" with "relevant to."[78] While the court has not yet delineated the precise parameters of "connected with" in this context, claims that share common or related core underlying facts appear to qualify.[79] Similarly, a "properly defensive" claim appears to include, at a minimum, one that would directly or inferentially rebut the facts on which the governmental entity's claim is predicated.[80] Some of our sister courts, along with at least one respected commentator, have further suggested that a claim that would be a compulsory counterclaim to the governmental entity's claim—i.e., it arises out of the same "transaction or occurrence" that is the

[78] *See Albert*, 354 S.W.3d at 375 (citing Black's Law Dictionary 756 (9th ed. 2009) (defining "germane" as "relevant, pertinent"); *see also Sweeny Cmty. Hosp. v. Mendez*, 226 S.W.3d 584, 592 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (observing that term "germane" generally means "closely akin," "being at once relevant and appropriate," "closely or significantly related," "relevant," and "pertinent" (citing Merriam-Webster's Collegiate Dictionary 525 (11th ed. 2003); Random House Webster's Unabridged Dictionary 800 (2d ed. 2001))).

[79] *See Albert*, 354 S.W.3d at 375 (claims "clearly were germane to . . . and connected with" governmental entity's claim where "they were both based on the question of pay for the Officers' employment."); *see also Mendez*, 226 S.W.3d at 592 (observing that, in common usage, "connected" means "united, joined, or linked" and "joined together in sequence; linked coherently" and "having parts or elements logically linked together" (citing Merriam-Webster's Collegiate Dictionary at 525; Random House Webster's Unabridged Dictionary at 800)).

[80] *See Albert*, 354 S.W.3d at 375 ("[T]he Officers' claims were properly defensive to the City's counterclaim because a finding that an officer had been underpaid would at least inferentially rebut the City's claim that the officer had been paid correctly or overpaid for the particular period for which the underpayment was made.").

subject matter of the government's claim[81]—would necessarily qualify as one that is "germane to," "connected with," and/or "properly defensive" to it.[82]

Each of Carowest's claims at issue must independently be "germane to, connected with, and properly defensive" to the City's monetary claim in order for it to fall within the district court's limited jurisdiction.[83] Nonetheless, Carowest's claims can be conveniently categorized into three groups for purposes of analysis: (1) its breach-of-contract claims; (2) its tort claims arising from the City's alleged conduct following execution of the Letter Agreement, including its actions in relation to the Yantis delay claim; and (3) its tort claims centering on, and seeking recovery for, the fill removed from the Original Channel Tract in May 2009.

The core contention underlying the City's claim for monetary relief is that Carowest breached the Letter Agreement and related agreements by "revoking the Drainage Channel Easement, revoking the Recreation Easement, and refusing to close on the sale of the NBU expansion tract." To prevail on this theory, the City must prove, among other operative facts, that it performed its own obligations under these agreements,[84] and it accordingly alleges that "it

[81] Tex. R. Civ. P. 97(a).

[82] *See Harris Cnty. v. Luna-Prudencio*, 294 S.W.3d 690, 697 (Tex. App.—Houston [1st Dist.] 2009, no pet.); *Mendez*, 226 S.W.3d at 592-93; William V. Dorsaneo III, et. al, *Texas Litigation Guide* § 293.01[1A] (2013) (citing these cases and concluding that "[a] defendant's compulsory counterclaim to a governmental unit's affirmative claim for relief necessarily qualifies under *Reata* as a claim that is germane to, connected with, and properly defensive to the governmental entity's claims."); *see also City of Dallas v. Redbird Dev. Corp.*, 143 S.W.3d 375, 383 (Tex. App.—Dallas 2004, no pet.).

[83] *See State v. Fidelity & Deposit Co. of Md.*, 223 S.W.3d 309, 311 (Tex. 2007) (per curiam) ("In light of *Reata*, a court must . . . specify the claims" that arise from the governmental entity's affirmative claims).

[84] *See C.W. 100 Louis Henna, Ltd. v. El Chico Rests. of Tex., L.P.*, 295 S.W.3d 748, 752 (Tex. App.—Austin 2009, no pet.) (to prevail on cause of action for breach of contract, claimant

complied with its obligations under the agreements . . . [and] has not committed any material breach of the Agreements." Carowest's breach-of-contract claims are essentially the converse of the City's contract claim, asserting that Carowest fully performed its obligations under the Letter Agreement and related agreements and that it was the City that failed to perform and materially breached its obligations. Carowest's contract claims are thus "germane to, connected with, and properly defensive to" the City's contract claim.[85] The same would be true of Carowest's claim for attorney's fees incident to this breach-of-contract claim, to the extent they are otherwise recoverable.[86]

We reach the same conclusion regarding Carowest's tort claims predicated on alleged conduct by the City occurring after the execution of the Letter Agreement. As a threshold observation, the fact that Carowest's claims sound in tort rather than contract does not in itself mean that they cannot be "germane to, connected with, and properly defensive to" the City's contract claim, as the inquiry's proper focus is on the operative facts rather than the particular legal theories

---

must prove that: (1) a valid contract existed between parties; (2) the claimant performed or tendered performance; (3) the defendant breached the contract; and (4) the claimant was damaged as result of breach); *see also Lennar Corp. v. Markel Am. Ins. Co.*, 413 S.W.3d 750, 755 n.28 (Tex. 2013) ("A fundamental principle of contract law is that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from any obligation to perform." (quoting *Hernandez v. Gulf Grp. Lloyds*, 875 S.W.2d 691, 692 (Tex. 1994))).

[85] *See Albert*, 354 S.W.3d at 375; *see also Redbird*, 143 S.W.3d at 383 (holding that claim of breach of lease was "incident to, connected with, arises out of, or is germane to" city's claim for unpaid rent and late charges because both parties' claim arose from the lease and "resolution of the rights of the parties [depended] on facts pertinent to the parties' conduct regarding the same lease").

[86] *See City of San Antonio v. KGME, Inc.*, 340 S.W.3d 870, 878 (Tex. App.—San Antonio 2011, no pet.) (construction company's claims for attorney's fees and interest under Texas Prompt Pay Act were "germane to, connected with and properly defensive to" municipality's claim of breach of contract); *see also Kinnear v. Texas Comm'n on Human Rights*, 14 S.W.3d 299, 300 (Tex. 2000) (per curiam) (explaining that because Commission had initiated proceeding under Fair Housing Act, and "Kinnear claimed attorney fees as a consequence of that suit," trial court had jurisdiction over claim for attorney's fees).

asserted.[87]  Turning to that inquiry, the chief focus of these tort claims, which are styled in terms of "fraud," "breach of fiduciary duty," and "conspiracy" to commit fraud, is the City's alleged efforts to conceal or mislead Carowest as to the true status of Yantis's delay claim while purporting to enforce Carowest's obligations under the Letter Agreement to indemnify the City against that claim. These claims will thus require determination of whether Carowest had a duty to indemnify the City against the Yantis delay claim at the time the City was making its indemnification demands. Consequently, these tort claims, like Carowest's contract claims, implicate the same core operative facts underlying the City's monetary claim—namely, whether the City and Carowest complied with their respective obligations under the Letter Agreement and related agreements—and proof that Carowest complied, the City did not, or both would inferentially rebut the City's claim.  The same would be true to the extent Carowest's claims complain of any additional conduct by the City that would amount to a breach of the City's contractual obligations or a defense to Carowest's asserted failure to perform.[88]  In these ways, Carowest's tort claims addressing alleged conduct by the City occurring after the execution of the Letter Agreement are "germane to, connected with, and properly defensive to" the City's contract claim.[89]

The third and final category of Carowest's claims at issue—its tort claims seeking to recover the value of the fill removed from the Original Channel Tract—presents a closer question at first glance.  These claims center on Carowest's asserted right to receive the fill from the Original

---

[87] *See Mendez*, 226 S.W.3d at 592-93 (physician's claims for tortious interference, defamation, and retaliation were germane to, connected with, and properly defensive to government hospital's claim for breach of employment contract).

[88] *See Mendez*, 226 S.W.3d at 592-93.

[89] *See Albert*, 354 S.W.3d at 375.  Of course, we are expressing no opinion as to whether such tort (or "con-tort") theories would ultimately be viable on the merits.

Channel Tract and the City's alleged efforts to deprive it of that right. The parties' disputes about this fill were among the "issues related to The South Tributary Project" that were "resolve[d]," i.e., settled, by the Letter Agreement. In other words, in asserting claims predicated on both the City's alleged breach of the Letter Agreement and the City's deprivation of the Original Channel Tract fill, Carowest seeks recovery under both a settlement agreement and some of the claims that underlie and were superseded by the agreement. These are separate sets of claims,[90] and Carowest could recover under one set of claims without proving the other. In fact, the theories would be logically inconsistent with one another, as one theory relies on the Letter Agreement while the other presumes it is ineffective. However, both sets of claims arise from the same "transaction" or "occurrence," to the extent the City's removal of the Original Channel Tract fill was a basis for the Letter Agreement.[91] As noted, there is authority from our sister courts for holding, on this basis alone, that Carowest's claims based on deprivation of the Original Channel Tract fill are "germane to, connected with, and properly defensive to" the City's contract claims.[92] In these ways, we believe, the City left "its sphere of immunity from suit" as to Carowest's underlying claims for deprivation of the Original Channel Tract fill to the same extent as with Carowest's claims under the Letter Agreement.

---

[90] *See, e.g.*, *Mantas v. Fifth Court of Appeals*, 925 S.W.3d 656, 658-59 (Tex. 1996) (per curiam) (citing *Padilla v. LaFrance*, 907 S.W.2d 454, 461-62 (Tex. 1995)).

[91] *See Lexington Ins. Co. v. Daybreak Express, Inc.*, 393 S.W.3d 242, 244-45 (Tex. 2013) (per curiam).

[92] *See KGME*, 340 S.W.3d at 877 (noting that construction company's claim and city's counterclaim "arise from the same facts and controversy" and concluding that company's breach of contract claim was "germane to, connected with, and properly defensive to" city's breach of contract claim); *Luna-Prudencio*, 294 S.W.3d at 697; *Mendez*, 226 S.W.3d at 592-93; *see also Redbird*, 143 S.W.3d at 383.

In sum, we hold that each of Carowest's common-law claims for money damages, as well as its claims for any attorney's fees recoverable incident to its breach-of-contract claims, is "germane to, connected with, and properly defensive to" the City's monetary claim, such that these claims do not implicate the City's governmental immunity to the extent of seeking a recovery offsetting any by the City.[93] To this extent, the district court possesses subject-matter to adjudicate these claims.[94]

### *Local Government Code chapter 271, subchapter I*

In light of the limited nature of the district court's jurisdiction that exists by virtue of the City's affirmative monetary claim, we must proceed to address another theory advanced by Carowest that would establish an alternative basis of subject-matter jurisdiction over some of its common-law monetary claims. Carowest invokes subchapter I of chapter 271 of the Local Government Code, which specifies that when a "local governmental entity" (which includes municipalities[95]) enters into "a contract subject to this subchapter," it "waives sovereign immunity to suit for the purpose of adjudicating a claim for breach of the contract, subject to the terms and conditions of this subchapter."[96] A "contract subject to this subchapter" is defined as "a written

---

[93] *See Fid. & Deposit Co.*, 223 S.W.3d at 311.

[94] *See Reata*, 197 S.W.3d at 377 ("[T]he City continues to have immunity from affirmative damage claims against it for monetary relief exceeding amounts necessary to offset the City's claims."); *see also City of Angleton v. USFilter Operating Servs., Inc.*, 201 S.W.3d 677, 678 (Tex. 2006) (per curiam) (error to hold that governmental entity's affirmative claim resulted in complete loss of its immunity).

[95] *See* Tex. Loc. Gov't Code § 271.151(3)(A).

[96] *Id*. § 271.152. As is apparent from context, "sovereign immunity" as used by the Legislature in subchapter I would necessarily refer to and include governmental immunity, which, again, is the derivative or version of sovereign immunity that applies to local governmental entities.

contract stating the essential terms of the agreement for providing goods or services to the local governmental entity that is properly executed on behalf of the local governmental entity."[97] "Adjudication" explicitly includes "the bringing of a civil suit and prosecution to final judgment."[98] The subchapter's "terms and conditions" on the waiver of immunity limit the monetary award in an "adjudication brought against a local governmental entity for breach of a contract" solely to:

- "[T]he balance due and owed by the local governmental entity under the contract . . . including any amount owed as compensation for the increased cost to perform the work as a direct result of owner-caused delays or acceleration."

- "[T]he amount owed for change orders or additional work the contractor is directed to perform by a local governmental entity in connection with the contract."

- "[R]easonable and necessary attorney's fees that are equitable and just."

- [I]nterest as allowed by law."[99]

Further, subchapter I does not waive immunity as to consequential damages (other than those explicitly permitted by the foregoing provisions),[100] exemplary damages,[101] or "a cause of action for a negligent or intentional tort,"[102] nor does it waive defenses to liability (as opposed to immunity

---

[97] *Id*. § 271.151(2)(A).

[98] *Id*. § 271.151(1).

[99] *Id*. § 271.153(a).

[100] *Id*. § 271.153(b)(1).

[101] *Id*. § 271.153(b)(2).

[102] *Id*. § 271.157.

from suit).[103] The Texas Supreme Court has recognized that subchapter I suffices as a "clear" and "unambiguous" waiver of governmental immunity to the extent that statute prescribes.[104]

Carowest relies on subchapter I to establish the district court's jurisdiction solely over its breach-of-contract claims. In response, the City seems to acknowledge that the agreements made the basis for Carowest's breach-of-contract claims are "contracts subject to" subchapter I,[105] but questions whether Carowest sufficiently pleads claims within the statute's waiver. The City also emphasizes that subchapter I does not waive its immunity as to claims other than Carowest's breach-of-contract claims (a proposition that Carowest does not appear to dispute) and that the waiver does not extend to the full range of damages that might conceivably be recoverable under such a theory, such as consequential damages. We conclude that Carowest's contract claims have invoked the district court's subject-matter jurisdiction, via subchapter I, to the extent of seeking recovery of the damages and attorney's fees for which the statute waives immunity.

The agreements on which Carowest's breach-of-contract claims are predicated, principally the Letter Agreement, Drainage Tract Development Agreement, and the Deed, all of which are in evidence, are each in writing, state their essential terms, and were properly executed on

---

[103] *Id*. § 271.155.

[104] *See Ben Bolt-Palito Blanco Consol. Indep. Sch. Dist. v. Texas Political Subdiv. Prop./Cas. Joint Self-Ins. Fund*, 212 S.W.3d 320, 327 (Tex. 2006).

[105] The City acknowledges that, in one of its filings below, it purported to "agree[] to be bound by the provisions of Chapter 271 of the Local Government Code," which, it observed, "provides for a waiver of immunity with regard to breach of contract claims under specific circumstances and specifically addresses the damages that a plaintiff may recover." Of course, it is the Legislature, not the City, that decides whether the City is "bound by the provisions of Chapter 271," but the thrust of the City's statement, considered in context, seems to acknowledge that the contracts at issue fall within subchapter I.

38

the City's behalf.[106]  The Letter Agreement and Drainage Tract Development Agreement are also plainly agreements "for providing goods or services" to the City[107]—namely, the construction of drainage improvement on Carowest's property.[108]  And while the Deed in itself concerns a real estate conveyance rather than "goods or services" as ordinarily understood, it is a component of the Letter Agreement, which is in part a contract "for providing goods and services" to the City, and the Legislature did not require that provision of "goods and services" be the exclusive or even primary purpose of the contract in order to come within subchapter I.[109]  Accordingly, we conclude that the district court has subject-matter jurisdiction to adjudicate Carowest's breach-of-contract claims, including its related claims for attorney's fees, to the extent of the recoveries permitted by subchapter I.

### *Conclusion regarding Carowest's common-law monetary claims*

Carowest has not invoked any further statutory waivers of the City's governmental immunity, or means of avoiding it, that would establish the district court's jurisdiction over any common-law monetary claims not already within its jurisdiction by virtue of Local Government

---

[106]  *See* Tex. Loc. Gov't Code § 271.151(2)(A).

[107]  *See id.*

[108]  *See, e.g.*, *Kirby Lake Dev. Ltd. v. Clear Lake City Water Auth.*, 320 S.W.3d 829, 839 (Tex. 2010) (holding that contract for developers to construct water and sewer facilities and then lease them to city free of charge was contract for "services" under subchapter I).

[109]  *See id.* (explaining that "the term [services] is broad enough to encompass a wide array of activities" and "[t]he services provided . . . need not be the primary purpose of the agreement"); *see also City of Houston v. Williams*, 353 S.W.3d 128, 138 (Tex. 2011) (noting that written contracts may be embodied in more than one document); *see also City of North Richland Hills v. Home Town Urban Partners, Ltd.*, 340 S.W.3d 900, 907 (Tex. App.—Fort Worth 2011, no pet.) (rejecting argument that development agreement with city was "merely a conveyance of real property" because it also required appellees to provide various services to city).

Code chapter 271, subsection I.[110]  Consequently, we hold that the district court did not err in overruling the City's plea to the jurisdiction with respect to Carowest's breach-of-contract claims to the extent Carowest seeks recovery of damages and attorney's fees within the waiver of governmental immunity provided by subsection I.  Additionally, the City's affirmative monetary claims give rise to an alternative and independent basis for jurisdiction to adjudicate both Carowest's contract and tort claims, to the extent of awarding damages as an offset to any recovery by the City.

**Declaratory claims**

The parties also join issue as to whether the district court possesses subject-matter jurisdiction over Carowest's declaratory claims.  The UDJA permits "[a] person interested under a

---

[110]  For example, Carowest does not purport to rely on the waivers in the Tort Claims Act. However, as an additional independent basis for the district court's jurisdiction over its breach-of-contract claim concerning the City's payment for the NBU expansion property, Carowest relies on the principle, recognized in the Texas Supreme Court's plurality opinion in *Texas A&M University-Kingsville v. Lawson*, that a governmental entity is not immune from suit for breaching a settlement agreement that resolved an underlying claim against which the government was not immune. 87 S.W.3d 518, 521-23 (Tex. 2002) (plurality op.).  Carowest emphasizes that the City, as previously explained, has no immunity against any claims for compensation based on its acquisition or "taking" of private property for public use through the exercise of its sovereign power and that the Letter Agreement, in part, explicitly "resolve[d] prior discussions concerning possible condemnation of Carowest Property for NBU purposes" through Carowest's agreement to sell the City "approximately six (6) acres of Carowest Property primarily for use in a[n] NBU future expansion."  The Deed, which explicitly incorporated the terms of the Letter Agreement, subsequently effectuated this conveyance.  On similar facts, the Fort Worth Court of Appeals, relying on the *Lawson* rationale, and over a dissent, held that governmental immunity did not shield a municipality against claims for breach of a contract whereby the plaintiffs had conveyed property to a city in lieu of the city acquiring it through eminent domain.  *See City of Carrollton v. Singer*, 232 S.W.3d 790, 796-800 (Tex. App.—Fort Worth 2007, pet. denied); *cf. id.* at 800-04 (Cayce, C.J., dissenting).  The City urges that *Singer* is wrongly decided.  We need not reach these contentions under the circumstances here.  *See* Tex. R. App. P. 47.1.  We have already concluded that Carowest's breach-of-contract claims come within the waiver of immunity in subchapter I and, further, we conclude that this waiver permits Carowest to recover the damages it seeks for breach of the City's obligation to pay it the purchase price of the Deed, the "balance due and owed by the local governmental entity under the contract." Tex. Loc. Gov't Code § 271.153(a)(1).

deed, will, written contract, or other writings constituting a contract or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise [to] have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder."[111] To that end, the UDJA also provides a waiver of sovereign or governmental immunity, but it is limited in scope to certain declaratory claims against governmental entities challenging the validity of legislative enactments, including declaratory claims against municipalities concerning "the validity of a municipal ordinance or franchise."[112] Otherwise, the UDJA does not alter the scope of a trial court's jurisdiction, but is "'merely a procedural device for deciding cases already within a court's jurisdiction.'"[113] Consequently, a UDJA declaratory claim asserted directly against a governmental entity, like other types of claims, will ordinarily be barred by immunity, thereby divesting the trial court of jurisdiction, unless the Legislature has waived immunity as to the subject matter of the claim.[114] Furthermore, "a litigant's couching its requested relief in terms of declaratory relief does not alter the underlying nature of the suit,"[115] such that a UDJA claim that might

---

[111] Tex. Civ. Prac. & Rem. Code § 37.004(a).

[112] *See id*. § 37.006(b) ("In any proceeding that involves the validity of a municipal ordinance or franchise, the municipality must be made a party . . . .").

[113] *Sawyer Trust*, 354 S.W.3d at 388 (quoting *Texas Ass'n of Bus.*, 852 S.W.2d at 444); *IT-Davy*, 74 S.W.3d at 855.

[114] *Sefzik*, 355 S.W.3d at 622; *cf. Heinrich*, 284 S.W.3d at 371-72 (explaining "ultra-vires exception" to sovereign or governmental immunity, whereby a claimant can sue a governmental *official*, in his or her official capacity, to compel the governmental entity, through its agent, to comply with non-discretionary delegated authority or duty).

[115] *Sawyer Trust*, 354 S.W.3d at 388 (citing *Heinrich*, 284 S.W.3d at 370-71; *IT-Davy*, 74 S.W.3d at 855).

otherwise be permissibly asserted against a governmental defendant will still be independently barred by immunity if it "has the effect of establishing a right to relief against [a governmental entity] for which the Legislature has not waived . . . immunity," like retrospective monetary relief or contractual liability.[116]

Through its declaratory claims, Carowest seeks determination of three sets of "question[s] of construction or validity arising under [an] instrument, statute, ordinance, contract, or franchise" that are within the UDJA's general scope: (1) whether the City violated the Texas Open Meetings Act during City Council meetings in May 2009 and May 2011; (2) the validity of the City contract under which Yantis was to construct the North Tributary Project; and (3) the validity of the Yantis delay claim or claims as they bear upon the parties' respective indemnification rights and duties under the Letter Agreement. The City has argued principally that these declaratory claims are barred by its governmental immunity because they are asserted against it directly, would have the further effect of establishing its liability under contracts, for damages, or both, and do not come within any waiver of that immunity.[117] In response, Carowest has not disputed that its claims, asserted as they are against the City, would implicate the City's governmental immunity, all

---

[116] *Id.* (citing *City of Houston v. Williams*, 216 S.W.3d 827, 828-29 (Tex. 2007) (per curiam)); *Creedmoor-Maha*, 307 S.W.3d at 515.

[117] *See, e.g.*, *Williams*, 216 S.W.3d at 828-29 (governmental immunity bars declaratory claim that would have the effect of awarding retrospective monetary relief against governmental entity); *IT-Davy*, 74 S.W.3d at 860 (immunity bars declaratory claim that would effectively impose contractual liability on governmental entity).

The City also seems to accuse Carowest of explicitly seeking to recover money damages under the UDJA, emphasizing the portions of Carowest's live petition in which it prays, with reference to all of its liability theories, for money damages. Carowest responds that the City is simply confused as to the content of its pleadings. We agree that Carowest's pleading cannot properly be construed as seeking monetary relief under the UDJA. *See, e.g.*, *Miranda*, 133 S.W.3d at 226 (we are to construe pleadings liberally in favor of jurisdiction).

42

other things being equal, nor has it purported to rely upon the UDJA's limited waiver permitting declaratory claims challenging the validity of municipal ordinances or franchises. Instead, Carowest has insisted that the subject matter of each of its declaratory claims is already within the district court's jurisdiction by virtue of various statutory waivers of immunity that are independent of and external to the UDJA. We consider these jurisdictional theories in turn.

### *Open Meetings Act*

To establish the district court's jurisdiction over its declaratory claims concerning alleged violations of the Texas Open Meetings Act (OMA), Carowest has relied upon an express waiver of immunity found within OMA. Specifically, OMA provides that "[a]n action taken by a governmental body in violation of [OMA] is voidable,"[118] and creates a cause of action whereby "[a]n interested person . . . may bring an action by mandamus or injunction to stop, prevent, or reverse a violation or threatened violation of [OMA] by members of a governmental body."[119] Carowest asserts, and we agree, that the substance of Carowest's declaratory claims regarding alleged OMA violations by the City fall squarely within this waiver. Carowest alleges that the City Council convened in executive sessions to discuss "public issues" and to "conceal[] the North Tributary Deal's quid pro quo arrangement between the City and Yantis," in derogation of OMA's requirement that "[e]very regular, special, or called meeting of a governmental body shall be open to the public."[120] Based on these allegations, Carowest seeks declarations that the City violated OMA, the effect of which would be to "reverse" the violations by rendering the related City actions

---

[118] Tex. Gov't Code § 551.141.

[119] *Id*. § 551.142(a).

[120] *See id*. § 551.002.

43

void. The fact that Carowest has sought the remedy of declaratory rather than equitable relief does not change the jurisdictional analysis here.[121]

In attempting to persuade us that the district court lacks jurisdiction over these claims, the City insists that Carowest's pleadings do not adequately negate the applicability of OMA's exceptions allowing governmental bodies to convene in executive session. The City's insistence on such specificity appears to be grounded on a misunderstanding that Carowest is relying (or can only rely) on the "ultra vires" exception to immunity to establish the district court's jurisdiction, an analysis that may indeed turn on whether alleged governmental actions would, as a matter of law, actually exceed lawful delegated authority.[122] But Carowest relies not on the "ultra vires" exception to the City's governmental immunity, but on OMA's express waiver of immunity, which requires only that Carowest bring an action seeking to reverse a violation or threatened violation of OMA, and Carowest's claims are plainly of this character. In that context, in short, the City's arguments

---

[121] *See Texas State Bd. of Veterinary Med. Exam'rs v. Giggleman*, 408 S.W.3d 696, 708 (Tex. App.—Austin 2013, no pet.) (observing that cause of action and waiver of immunity in the Public Information Act parallel to that in OMA could provide "a jurisdictional basis" for UDJA claims challenging withholding of information in alleged violation of the PIA); *Hendee*, 228 S.W.3d at 379 n.31 (noting that if plaintiffs had standing under taxpayer exception to seek injunction to prevent expenditures, then UDJA would also allow them to bring claim for declaratory relief); *but cf. Jackson v. State Office of Admin. Hearings*, 351 S.W.3d 290, 301 (Tex. 2011) (illustrating limitations on use of UDJA to recover attorney's fees not obtainable though the underlying statutory waiver that confers jurisdiction on the trial court).

[122] *See Heinrich*, 284 S.W.3d at 372-73 (ultra vires suit "must not complain of a government officer's exercise of discretion, but rather must allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act"); *Texas Dep't of Transp. v. Sunset Transp.*, 357 S.W.3d 691, 701-02 (Tex. App.—Austin 2011, pet. denied) ("To determine whether appellees have asserted a valid ultra vires claim that invokes the district court's subject-matter jurisdiction, we would construe the provisions of the [statutes] that define the scope of [the agency's] legal authority, apply them to the facts that appellees have alleged, and ascertain whether those facts constitute acts beyond [the agency's] legal authority." (citing *Heinrich*, 284 S.W.3d at 372-73; *Creedmoor-Maha*, 307 S.W.3d at 516 n.8)).

44

implicate only the merits of Carowest's claims, not the district court's jurisdiction to decide them.[123]

Accordingly, the district court did not err in overruling the City's plea as to Carowest's declaratory claims regarding OMA violations.

### Local Government Code chapter 252

With respect to Carowest's declaratory claim challenging the City's contract with Yantis on the North Tributary Project, it relies on an express waiver of immunity found within chapter 252 of the Local Government Code. Chapter 252, entitled "Purchasing and Contracting Authority of Municipalities," imposes competitive-bidding requirements for certain purchases made by municipalities.[124] "If [a] contract is made without compliance with this chapter," chapter 252 further provides, "it is void, and the performance of the contract, including the payment of any money under the contract, may be enjoined by" persons that include, of relevance here, "any property tax paying resident of the municipality."[125]

Similar to its claims concerning OMA violations, Carowest asserts a declaratory claim whose subject matter would fall squarely within chapter 252's waiver of governmental immunity—it seeks a declaration that the City violated chapter 252 in regard to the North Tributary Contract, thereby rendering that contract void and unenforceable.[126] The City advances no cogent

---

[123] *See Sunset Transp.*, 357 S.W.3d at 702; *see also Bland*, 34 S.W.3d at 554.

[124] *See* Tex. Loc. Gov't Code §§ 252.001-.063.

[125] *Id*. § 252.061; *cf. Texas Logos, L.P. v. Texas Dep't of Transp.*, 241 S.W.3d 105, 121-22 (Tex. App.—Austin 2007, no pet.) (reasoning that otherwise proper declaratory claim predicated on ultra vires conduct was barred by sovereign immunity to extent it sought to invalidate previously executed state contract (citing *Williams*, 216 S.W.3d at 828-29)).

[126] *See Dallas Cnty. v. Cedar Springs Invs., L.L.C.*, 375 S.W.3d 317, 321 (Tex. App.—Dallas 2012, no pet.) (holding that analogous provision applicable to counties under chapter 262 of

argument to the contrary.[127]   However, the City argues that Carowest lacks standing to assert this claim because it is not a "property tax paying resident" of the City, as chapter 252 requires.

Carowest counters by pointing out evidence presented to the district court—namely, records of the Comal Central Appraisal District—confirming that Carowest not only owns property within the City, but has also paid taxes on that property to the City and other local governmental entities since at least 1998.  The City acknowledges these facts, but insists that merely owning property in the City and paying property taxes to the City is not enough to make Carowest a "property tax paying *resident*" of the City for purposes of chapter 252.  And, in regard to Carowest's "residency," the City emphasizes two additional documents in evidence, both of which were certified copies of records on file with the Texas Secretary of State's office:  (1) Carowest's certificate of limited partnership, dated May 1998, stating that the addresses of Carowest's registered office, principal office, and sole general partner were each in San Antonio, not New Braunfels; and (2) a certificate of fact from the Secretary of State, dated September 2011, stating that the address of

Local Government Code operates as a waiver of immunity); *Labrado v. County of El Paso*, 132 S.W.3d 581, 587-88 (Tex. App.—El Paso 2004, no pet.) (concluding that (1) standing for injunctive relief under chapter 262 includes standing to seek declaratory relief to that effect and (2) appellant's claims for injunctive relief and declaratory relief under chapter 262 and UDJA were not barred by sovereign immunity).

[127]  Although the City asserts that Carowest "has not demonstrated that the City has waived its governmental immunity concerning the North Tributary Contract to assert this declaratory judgment action against the City," the sole support it offers for that contention consists of a recitation of general substantive and procedural concepts related to pleas to the jurisdiction raising sovereign or governmental immunity, followed by a brief argument disputing that its immunity regarding claims challenging the North Tributary Contract has been waived by subsection I of Local Government Code chapter 271, a contention that Carowest does not appear to be advancing. The City never addresses, much less disputes, the contention that Carowest does make—whether Carowest's declaratory claim regarding the North Tributary Contract comes within the waiver of Local Government Code chapter 252—apart from its assertions regarding Carowest's standing to assert that claim.

Carowest's registered agent was in San Antonio. In the City's view, these documents conclusively negate that Carowest is a "resident" of New Braunfels and, thus, its standing to assert a claim under chapter 252.

In reply, Carowest insists that no Texas court has ever drawn a distinction between property ownership and "residency" as that concept has been used within chapter 252 and its statutory predecessors. Even if the statute drew such a distinction, Carowest further asserts, its principal place of business at times relevant to this litigation has been in New Braunfels. Indeed, the district court heard evidence to that effect, including provisions of the Letter Agreement and some of the related agreements prescribing that any notices to Carowest required under the agreement may be directed to a Mrs. Elizabeth Weston at a New Braunfels street address located near the street address of the Carowest property at issue in this case.

Assuming without deciding that, as the City maintains, there is some material distinction between property tax payment or property ownership and "residency" in determining standing to assert a claim under chapter 252, the district court would not have erred in impliedly finding that Carowest not only pays property taxes to the City, but is also a resident there.[128]

---

[128] *See Combs v. Entertainment Publ'ns, Inc.*, 292 S.W.3d 712, 719 (Tex. App.—Austin 2009, no pet.) ("Where the jurisdictional issues or facts do *not* implicate the merits of the case, and the facts are disputed, the court—not the jury—must make the necessary fact findings to resolve the jurisdictional issue."). Alternatively, to the extent this standing issue is more properly viewed as overlapping the merits of Carowest's claim in reliance on chapter 252, a fact issue exists as to Carowest's residency, precluding the district court from granting the City's plea to the jurisdiction as to Carowest's claim. *Miranda*, 133 S.W.3d at 227-28 ("[I]n a case in which the jurisdictional challenge implicates the merits of the plaintiffs' cause of action and the plea to the jurisdiction includes evidence, the trial court reviews the relevant evidence to determine if a fact issue exists. . . . If the evidence creates a fact question regarding the jurisdictional issue, then the trial court cannot grant the plea to the jurisdiction, and the fact issue will be resolved by the fact finder.").

Consequently, the district court did not err in concluding that Carowest had standing to bring a claim under chapter 252 and, in turn, denying the City's plea to the jurisdiction as to Carowest's declaratory claim regarding the North Tributary Project contract.

### The Yantis delay claim

The third and final declaratory claim at issue concerns the validity of the Yantis delay claim as it bears upon the parties' respective obligations in regard to indemnity under the Letter Agreement. The City insists that Carowest's declaratory claim seeks to improperly "circumvent [governmental] immunity from suit by characterizing [a] suit for money damages as a declaratory judgment claim," an apparent reference to the principle that immunity bars a UDJA claim otherwise properly asserted against a governmental entity or officer if the declaratory remedy would have the effect of awarding relief that is independently barred by immunity, such as retrospective monetary relief or a declaration of liability under a contract.[129] The City is correct to the extent that the declaration Carowest seeks would have the effect of establishing the City's rights and potential liability under the Letter Agreement. However, we have already held that these issues are within the district court's jurisdiction to adjudicate by virtue of the waiver of immunity in Local Government Code chapter 271, subsection I[130] and the limited jurisdiction that arises by virtue of the City's claim

---

[129] *See, e.g.*, *Williams*, 216 S.W.3d at 828-29 (declaratory claim that would have the effect of awarding retrospective monetary relief against governmental entity); *IT-Davy*, 74 S.W.3d at 860 (declaratory claim that would effectively impose contractual liability on governmental entity).

[130] *See Ben Bolt*, 212 S.W.3d at 327-28 (concluding that section 271.152 of Local Government Code waived immunity from suit with respect to declaratory claim seeking determination of rights under contract covered by that statute); *Texas Ass'n of Sch. Bds. Risk Mgmt. Fund v. Benavides Indep. Sch. Dist.*, 221 S.W.3d 732, 739 (Tex. App.—San Antonio 2007, no pet.) (same).

48

for monetary relief. In light of these holdings, we reject the City's attempt to raise governmental immunity as a jurisdictional bar to Carowest's declaratory claim founded on the same subject matter.

In addition to relying on governmental immunity, the City asserts that Carowest's declaratory claim concerning the Yantis delay claim is now moot because, as Carowest alleges, Yantis released the delay claim in connection with the City's award to it of the North Tributary Project contract.[131] The City's argument obviously presumes the validity of the release, and as long as Carowest is prosecuting a viable declaratory clam seeking to invalidate the "North Tributary Deal" in which the delay claim purportedly was settled, there remains a justiciable controversy regarding that underlying claim. Moreover, even if the release is assumed to resolve the delay claim prospectively from the date of its execution, the validity of the delay claim would still remain a live and justiciable issue to the extent it bears upon the parties' past compliance with the Letter Agreement's indemnification provisions.

In sum, the district court did not err in overruling the City's plea to the jurisdiction as to each of Carowest's claims seeking declaratory relief under the UDJA.[132]

**CONCLUSION**

Based on the foregoing analysis, we:

---

[131] In fact, the evidence includes a Rule 11 agreement dated May 9, 2011, and signed by counsel for both the City and Yantis, agreeing that "Yantis will agree to fully release the City of New Braunfels from Yantis's asserted delay claim on the South Tributary Project if, after all proper and legal process is completed, Yantis is awarded the North Tributary Contract . . . at the New Braunfels City Council meeting scheduled for this evening." "If the contract is not awarded to Yantis tonight," the agreement further provides, "this offer is hereby withdrawn."

[132] The availability of UDJA attorney's fees may be another matter, however. *See Jackson*, 351 S.W.3d at 301; *MBM Fin. Corp. v. Woodlands Operating Co., L.P.*, 292 S.W.3d 660, 669 (Tex. 2009); *Giggleman*, 408 S.W.3d at 707-08.

- Reverse the district court's order denying the City's plea to the jurisdiction as to Carowest's takings claim and render judgment dismissing that claim for want of subject-matter jurisdiction.

- Reverse the district court's order as to Carowest's claims under Section 1983, and remand the claims so that Carowest may have a reasonable opportunity to amend its pleadings, if possible, to assert a Section 1983 claim that is not subsumed within its takings claim.

- Affirm the district court's order denying the City's plea as to Carowest's common-law tort claims, contract claims, and related attorney's-fees claims to the extent the court has jurisdiction (1) to adjudicate Carowest's breach-of-contract and related attorney's fees claims by virtue of the waiver of immunity in chapter 252 of the Local Government Code; and (2) alternatively and independently, to adjudicate Carowest's entitlement to an offset against any recovery obtained by the City on its monetary counterclaim.

- Affirm the district court's order denying the City's plea to the jurisdiction as to Carowest's declaratory claims.

_____

Bob Pemberton, Justice

Before Justices Puryear, Pemberton, and Henson;
    Justice Henson not participating

Affirmed in part; Reversed and Rendered in part; Reversed and Remanded in part

Filed:  April 30, 2014