# NO. 12-18-00047-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *PETER RUNNING, JAMIE RUNNING, AND CINDY WILKINS, APPELLANTS/CROSS-APPELLEES, APPELLANTS* | *§* | *APPEAL FROM THE 392ND* |
| *V.* | *§* | *JUDICIAL DISTRICT COURT* |
| *THE CITY OF ATHENS, TEXAS AND ATHENS MUNICIPAL WATER AUTHORITY, APPELLEES/CROSS-APPELLANTS, APPELLEES* | *§* | *HENDERSON COUNTY, TEXAS* |

*MEMORANDUM OPINION*

Peter Running, Jamie Running, and Cindy Wilkins (the Residents) filed negligence, state and federal inverse condemnation, and Texas Water Code violation claims against the City of Athens, Texas (the City) and Athens Municipal Water Authority (AMWA), alleging that they caused water to overflow from a water treatment plant owned and operated by them near Lake Athens, which flooded the Residents' homes and lots.

The City and AMWA filed pleas to the jurisdiction challenging the Residents' claims. The trial court dismissed the alleged Texas Water Code violations and all the Residents' claims against AMWA. However, the trial court denied the City's plea to the jurisdiction as to the Residents' negligence claim and state and federal inverse condemnation claims.

The Residents appealed the trial court's order dismissing their Texas Water Code violation claims, along with the trial court's order dismissing all their claims against AMWA. We dismissed the Residents' appeal for want of prosecution.[1] The City filed a cross-appeal challenging the trial

---

[1] *See* **Running v. City of Athens**, No. 12-18-00047-CV, 2018 WL 2326775, at *1 (Tex. App.—Tyler May 23, 2018, no pet.) (per curiam) (mem. op.).

court's order denying its plea to the jurisdiction as to the Residents' negligence and state and federal inverse condemnation claims against it. Because we have disposed of the Residents' appeal, and there are no live claims against AMWA, only the City's cross-appeal remains before this court. We reverse the trial court's order denying the City's plea to the jurisdiction and render judgment dismissing the Residents' claims against the City.

## BACKGROUND

The City operates a water treatment plant near Lake Athens.[2] The plant provides potable water to the citizens of Athens, Texas. The plant is located at the top of a hill that slopes towards the lake from which raw water is drawn for processing. The Residents live directly downhill from the plant near the shoreline of Lake Athens.

The Residents allege in their petition that in May 2015, December 2015, and March 2016, there were releases of water from a holding tank of treated water at the plant (Clearwell No. 2) that caused flood damages to their real property and homes.

The City filed a plea to the jurisdiction, alleging that governmental immunity barred the Residents' suit. The Residents responded that the Texas Tort Claims Act (TTCA) provided a waiver of immunity, namely that their damages were proximately caused by the negligence of a city employee arising from the use or operation of motor-driven equipment appurtenant to Clearwell No. 2.[3] Specifically, the Residents alleged that the plant contains motor-driven equipment such as pumps, valves, and water level monitoring equipment that the City's employees operated or maintained in a negligent manner that caused the release of water resulting in floods that damaged their homes and property. The Residents also contended that the trial court had jurisdiction because they asserted viable inverse condemnation claims under the United States and Texas Constitutions.

After a hearing, the trial court overruled the City's plea to the jurisdiction. As described above, this cross-appeal followed.

---

[2] AMWA owns the real property and facility where the plant is located, but the plant is operated by the City.

[3] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.021(1) (West 2019).

2

In its first and second issues, the City contends that the Residents failed to establish the TTCA requirement that their claims arose from the use or operation of motor-driven equipment.

**Standard of Review**

Governmental immunity from suit defeats the trial court's subject matter jurisdiction and is properly raised in a plea to the jurisdiction. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 225–26 (Tex. 2004). A plea to the jurisdiction challenges the trial court's power to exercise subject matter jurisdiction over a claim. *Id.* at 226. Where a government entity challenges the court's subject matter jurisdiction on the basis of immunity, the plaintiff must affirmatively demonstrate the court's jurisdiction by alleging a valid waiver of immunity. *Ryder Integrated Logistics, Inc. v. Fayette County*, 453 S.W.3d 922, 927 (Tex. 2015).

We review a trial court's ruling on a plea to the jurisdiction using a de novo standard of review. *See State v. Holland*, 221 S.W.3d 639, 642 (Tex. 2007); *Miranda*, 133 S.W.3d at 226. A plea to the jurisdiction is a dilatory plea, which is typically used to defeat a plaintiff's cause of action without regard to whether the claims have merit. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000). When evidence is presented with a plea to the jurisdiction, the court reviews the relevant evidence and may rule on the plea as a matter of law if the evidence does not raise a fact issue on the jurisdictional question, a standard that generally mirrors the summary judgment standard. *Harris Cty. Flood Control Dist. v. Kerr*, 499 S.W.3d 793, 798 (Tex. 2016) (citing *Miranda*, 133 S.W.3d at 227–28).

"When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence." *Suarez v. City of Texas City*, 465 S.W.3d 623, 634 (Tex. 2015) (quoting *Browning–Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 927 & n.3 (Tex. 1993)). Evidence that is so slight as to make any inference a guess is in legal effect no evidence. *Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 601 (Tex. 2004). Circumstantial evidence can establish actual knowledge but such evidence must "either directly or by reasonable inference" support that conclusion. *Suarez*, 465 S.W.3d at 634. However, an inference is not reasonable if it is premised on mere suspicion—"some suspicion linked to other suspicion produces only more suspicion, which is not the same as some evidence." *Id.* (citing *Marathon Corp. v. Pitzner,* 106 S.W.3d 724, 727–28 (Tex. 2003)). Stated another way, an inference is not reasonable if it is susceptible to

multiple, equally probable inferences, requiring the factfinder to guess in order to reach a conclusion. *See id.* (citing *Ridgway,* 135 S.W.3d at 601).

**Applicable Law**

The TTCA provides a limited waiver of governmental immunity. *Alexander v. Walker,* 435 S.W.3d 789, 790 (Tex. 2014). In relevant part, a governmental unit in the state is liable for

> property damage, personal injury, and death proximately caused by the wrongful act or omission or the negligence of an employee acting within the scope of employment if:
>
> > A. the property damage, personal injury, or death arises from the operation or use of a motor-driven vehicle or motor-driven equipment; and
> >
> > B. the employee would be personally liable to the claimant according to Texas law. . . .

TEX. CIV. PRAC. & REM. CODE ANN. § 101.021 (West 2019).

The term "motor-driven equipment" refers to articles or implements driven by a motor and used for a specific purpose or activity. *See **Tex. Nat. Res. Conservation Comm'n v. White***, 46 S.W.3d 864, 868 (Tex. 2001). This term includes motor-driven pumps. *See id.* (holding that electrical motor-driven pump used to dissipate fumes satisfies TTCA definition of "motor-driven" equipment). The Texas Supreme Court has explained that the term "operation," as it is used in the TTCA, refers to "a doing or performing of a practical work." *LeLeaux v. Hamshire-Fannett Indep. Sch. Dist.*, 835 S.W.2d 49, 51 (Tex. 1992). "Use" means "to put or bring into action or service; to employ for or apply to a given purpose." *Id.*

The statute itself does not define "arises from." This standard requires a "nexus between the operation or use of the motor-driven . . . equipment and a plaintiff's injuries." *Ryder Integrated Logistics*, 453 S.W.3d at 927. Such a nexus requires more than mere involvement of equipment but rather "the equipment's use must have actually caused the injury." *Dallas Area Rapid Transit v. Whitley*, 104 S.W.3d 540, 543 (Tex. 2003) (quoting *White,* 46 S.W.3d at 869). The operation or use of motor-driven equipment "does not cause injury if it does no more than furnish the condition that makes the injury possible." *Dallas Cnty. Mental Health & Mental Retardation v. Bossley*, 968 S.W.2d 339, 343 (Tex. 1998). The Texas Supreme Court described this threshold as something more than actual cause but less than proximate cause. *See Ryder Integrated Logistics*, 453 S.W.3d at 928-29. But a plaintiff can satisfy the "arising from" standard by demonstrating

4

proximate cause. *Id.* at 929. "Given the Legislature's preference for a limited immunity waiver, we strictly construe section 101.021's [motor-driven equipment use] requirement." *Id.* at 927.

**Discussion**

Jimmie Anderson, the City's former Water Superintendent, testified that Clearwell No. 2 is a metal holding tank in which treated water is stored until needed for distribution in the City. There are four "high service" motorized pumps that pull treated water from Clearwell No. 2 into the distribution center and service lines for residential use. The high service pumps are button-activated by the operator in the treatment plant's control room. When the high service pumps are activated, pressure from the pumps opens a mechanical check valve, allowing water to flow through the lines. When the high service pumps are off, the lack of pressure and a counterweight closes the check valve, preventing water flow through the lines.[4] In May 2015, the check valve in one of the lines was sometimes stuck in the open position, allowing water to flow back into Clearwell No. 2 once the high service pumps stopped.[5] This backflow could raise the level of water stored in Clearwell No. 2. If the water level in Clearwell No. 2 raised to 32.5 feet, the excess would drain from an overflow tube onto a concrete pad. The excess water flow was designed to run down the hill into a ditch along a roadway away from the Residents' homes, and eventually end up in the lake.

Anderson testified that the valve was trapped in the open position at some point on the day in question and noted that it was the likely cause of any backflow that day. The residents contend that these facts show a waiver under the TTCA, alleging that their damages arose from the use or operation of these pumps, which created an excessive overflow that flooded their properties. We disagree. The use or operation of the high service pumps merely furnished the condition that allowed the backflow to occur. When operating, the pumps opened the mechanical valve. Once the pumps ceased operation, the mechanical valve, a non-motorized piece of equipment, would occasionally become stuck and allow backflow, which resulted in a release of water from the overflow tube if the water level in Clearwell No. 2 became high enough. The defective non-motorized mechanical valve was the actual cause of any overflow, not the motor-driven high

---

[4] The high service pumps ceased operation when there was no demand for water from customers.

[5] This was a known condition by personnel at the plant, and the operator on duty would manually close the valve and/or activate high service pumps to prevent excessive backflow. Anderson explained that they tried to avoid any overflow from Clearwell No. 2 because the overflow was treated water, which was expensive to produce.

5

service pumps, which is insufficient to establish a waiver under the TTCA. *See Galveston Racquet Club, Inc. v. City of Galveston*, 178 S.W.3d 167, 170-71 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (holding immunity not waived under TTCA when damage was caused by deteriorated water lines rather than actual use or operation of water pump that merely created condition of pressurized water flow into the lines).

The Residents also argue that the City could have remedied any overflow by turning on the high service pumps to prevent backflow into Clearwell No. 2. However, this is an allegation that the City failed to use motor-driven equipment to prevent the harm, which is not "use or operation" within the meaning of the TTCA and will not support a waiver of immunity. *See White*, 46 S.W.3d at 869 (holding governmental unit's failure to use a motor-driven pump to dissipate fumes does not waive immunity under TTCA).

Next, the Residents contend that another set of pumps also created or contributed to the excessive overflow from Clearwell No. 2 in May 2015. Anderson testified that motorized pumps at the lake could pump water into the plant's filters, which could force water into Clearwell No. 2, and eventually create or contribute to an overflow. Anderson explained that if there was a power surge, such as from a lightning strike, the lake pumps could start pumping water to the filters, which had motorized actuators. He explained that normally, during such conditions, the operator should turn the filters to the "off" or "manual" position. In such cases, any water pumping from the lake into the filters would simply drain into the lagoons and return to the lake. He further explained that if there was a power surge and the filters remained in the "automatic" position, the filters could possibly fill the clarifiers with water, which could ultimately flow into Clearwell No. 2. However, he stated that the clarifiers also have drains that slow any overflow. In essence, the Residents argue that the operator on duty negligently omitted to turn off the filters after a lightning strike or power surge, which allowed the motor-operated pumps at the lake to pump water into the filters that ultimately ended up in Clearwell No. 2 and contributed to the overflow.

The record is not clear as to whether the filters were in the automatic mode during the incident in question.[6] Even assuming that the filters were left in the automatic position and a power

_____

[6] During Anderson's deposition, counsel asked a question based on the then on-duty operator's notes that are not in the appellate record concerning whether the filters were in the automatic mode. Anderson answered hypothetically that if the filters were in automatic mode, the correct procedure would be to turn them to "off" or "manual." He never opined that they were actually in automatic mode. The parties did not depose the operator. The Residents also point to Anderson's general testimony that the "filters were running" after the lightning strike. However, it is clear from the context that he meant that the lightning strike did not damage the filters; he did not testify

6

surge occurred, there is no indication that the lake pumps actually activated or that the filters and clarifiers filled to a level that contributed to the overflow. Anderson stated that he has only seen the lake pumps activate in these conditions "sometimes" in his thirty years of experience. Even if the lake pumps activated, Anderson indicated only that it was "possible" that water would end up in Clearwell No. 2 had all of these conditions occurred on the evening in question.

Anderson testified that if these conditions occurred, it could take up to an hour for any overflow attributable to the lake pumps and filters to begin. He testified that there is no way to determine exactly how much water overflow occurred, or what portion was caused by backflow due to the faulty mechanical valve versus water pumped from the filters into Clearwell No. 2. However, he explained that there was a "pretty good flow" from any backflow attributable to the faulty mechanical valve, and that if Clearwell No. 2 had overflowed, about 15,000 gallons of water, which represents one foot of water level in the tank, would flow through the overflow tube in five to ten minutes.[7]

Anderson's testimony is the only evidence that the filters contributed to the flooding of the Residents' homes. His testimony is no more than a mere scintilla of evidence that the filters caused or contributed to the overflow, because it rests on surmise or suspicion. *See Suarez*, 465 S.W.3d at 634. His testimony that (1) the filters could have been in automatic mode, (2) the lake pumps sometimes have activated after a lightning strike in his thirty years of experience, (3) the filters and clarifiers could have overflowed despite the drain systems, and (4) it was possible that water from the filters could have ended up in Clearwell No. 2—is some suspicion linked to other suspicion that produces only more suspicion, which is not the same as some evidence. *See id.* Moreover, any inference that the filters caused or contributed to the flooding is so slight as to be a guess, which is in legal effect no evidence. *See Ridgway*, 135 S.W.3d at 601; *Lockett v. HB Zachry Co.*, 285 S.W.3d 63, 71–72 (Tex. App.—Houston [1st Dist.] 2009, no pet.) (holding deposition testimony that there was "possibility" that wrongful death claimant was exposed to

---

that they were actually operating at that specific time. *See San Jacinto River Auth. v. Simmons*, 167 S.W.3d 603, 608 (Tex. App.—Beaumont 2005, no pet.) (holding no TTCA waiver when deposition testimony describing generalized scenario that misuse of motor-driven belt press caused overflow of biosolids in container, resulting in plaintiff's slip and fall, but testimony was unaccompanied by indication that the scenario actually occurred).

[7] Anderson also testified that the water towers were nearly full on the day in question, and that the levels had dropped in one of the water towers after the lightning strike. However, he testified that this droppage was normal and could be explained by resident usage of water.

benzene was no more than scintilla and insufficient to raise fact issue). In contrast, Anderson testified concretely that any backflow was directly caused by the defective mechanical valve. We also note that the area had historical rainfall totals in May 2015.

Finally, the Residents' also argue that we should view the entire plant as one system, and that each set of pumps and the motor-operated equipment are just components of this system. Even if we were to conclude that this analysis is correct, a question we need not address, the Residents still had the burden to provide more than a scintilla of evidence that the City's operation or use of some piece of motor-driven equipment as part of this system actually caused them harm. As we have explained, they failed to meet this burden. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.021; *Whitley*, 104 S.W.3d at 543; *White*, 46 S.W.3d at 869. The City's first and second issues are sustained.

## INVERSE CONDEMNATION – TEXAS CONSTITUTION

The City argues in its third issue that the trial court erred because the Residents failed to raise a viable inverse condemnation claim under the Texas Constitution.

### Standard of Review and Applicable Law

The Texas Constitution provides that no "property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made." TEX. CONST. art. I, § 17(a). To establish a claim under this provision, a plaintiff must prove: (1) the government intentionally performed certain acts; (2) that resulted in the plaintiff's property being taken, damaged, or destroyed; (3) for public use. *Gen. Servs. Comm'n v. Little-Tex Insulation Co., Inc.*, 39 S.W.3d 591, 598 (Tex. 2001). This constitutional provision applies to an inverse condemnation claim "in which a property owner alleges that the government has usurped the use and value of his or her property, even if it has not completely appropriated title." *Kirby Lake*, 320 S.W.3d at 844.

Governmental immunity does not shield the City from a properly-pled inverse condemnation claim. *City of Houston v. Carlson*, 451 S.W.3d 828, 830 (Tex. 2014). Conversely, if a plaintiff cannot establish a "viable" inverse condemnation claim, the government retains immunity, and the court lacks jurisdiction over the dispute. *Texas Dep't of Transp. v. A.P.I. Pipe & Supply, LLC*, 397 S.W.3d 162, 166 (Tex. 2013). Accordingly, a governmental unit may properly challenge an inverse condemnation claim through a plea to the jurisdiction. *See id.* As

with the plea to the jurisdiction on the TTCA claim, we examine the evidence presented at the hearing to determine whether the evidence raises a fact issue on the relevant jurisdictional questions. *See Kerr*, 499 S.W.3d at 798.

In the context of an inverse condemnation claim, "the requisite intent is present when a governmental entity knows that a specific act is causing identifiable harm or knows that the harm is substantially certain to result." *Tarrant Reg'l Water Dist. v. Gragg*, 151 S.W.3d 546, 555 (Tex. 2004). A governmental entity is substantially certain that its actions will damage property when the damage is necessarily an incident to or necessarily a consequential result of the governmental entity's action. *City of San Antonio v. Pollock*, 284 S.W.3d 809, 821 (Tex. 2009). It is not enough that the act causing the harm be intentional—there must also be knowledge to a substantial certainty that the harm will occur. *City of Dallas v. Jennings*, 142 S.W.3d 310, 313–14 (Tex. 2004).

A taking "cannot be established by proof of mere negligent conduct by the government." *Harris Cty. Flood Control Dist. v. Kerr*, 499 S.W.3d 793, 799 (Tex. 2016). "[A]wareness of the mere possibility of damage is no evidence of intent." *Pollock*, 284 S.W.3d at 821. The government's knowledge must be determined as of the time it acted, not with the benefit of hindsight. *Id.* Finally, the intentional government act must have been the proximate cause of the damages. *Hearts Bluff Game Ranch, Inc. v. State*, 381 S.W.3d 468, 483-84 (Tex. 2012).

**Discussion**

The factual bases for the Residents' claims center upon the City's negligence in failing to prevent overflow from Clearwell No. 2 that flooded to their property. Thus, their claims sound in negligence, which is not a viable inverse condemnation claim. *See Kerr*, 499 S.W.3d at 799; *Pollock*, 284 S.W.3d at 821.

The Residents nevertheless contend that they satisfied their burden to establish a viable inverse condemnation claim on the intent element. As support, the Residents rely on Jamie Running's testimony concerning her conversations with Bill Casey (AMWA's Director) and Glenn Herriage (the City's Utilities Director), as well as the fact that there were three discharges of water that they argue would put the City on notice that flooding was substantially certain.

Jamie testified that Herriage and Casey told her that the common practice was to release water from Clearwell No. 2 when it became too full and that Herriage told her that they had engaged in this pattern for twenty years. First, we note that the Residents did not depose Herriage.

9

Rather, they argue in their brief that they "know that his testimony will satisfy the element because his testimony will be that the City and AMWA have both known for decades that the water runs down the hill, that a high overflow situation . . . would result in flooding down the hill towards the Residents' parcels . . ., and that high amounts of water will cause real property and home damage."

The Residents also rely on Jamie Running's conversation with Bill Casey.[8] Jamie testified that Casey informed her that AMWA had funding available to redirect the waterflow down into a ditch away from the Residents' homes. She also testified that Casey told her that all the City needed to do was ask for the funding. But Casey was an AMWA employee, not a City employee. This statement is not evidence that the City knew that the harm to the Residents' property was substantially certain to result from an unintentional release of water during a period of heavy precipitation. In fact, Jamie admitted that Casey never stated that he advised City staff of this solution or that redirecting the water was even a plausible solution. Moreover, she admitted that Casey never indicated that he discussed the issue with the City. Rather, Casey's statements indicate a lack of communication between the City and AMWA concerning the Residents' claims, and even if AMWA knew of the Residents' flooding issue, there is no evidence from these statements that the City knew about it.[9] Even fully crediting Jamie's hearsay conversations with Casey and Herriage, the relevant statements at most show an intent to release the water. None of the statements show that the City intended the harm, knew that it would occur, or that the flooding suffered by the Residents was necessarily an incident to or necessarily a consequential result of the City's action. *See* ***Pollock***, 284 S.W.3d at 821; ***San Antonio Water Sys. v. Overby***, 429 S.W.3d 716, 721 (Tex. App.—San Antonio 2014, no pet.).

The Residents also claim that the City knew about the harm because there were multiple releases of water. First, the Residents rely on Jamie's testimony that Casey and Herriage told her that they had released the water several times over the past twenty years as common practice.[10] There is nothing showing that this fact, if true, meant that the City knew or was substantially certain

---

[8] Jamie testified that she had two conversations with Bill Casey on the subject, but she could not remember the content of the second discussion.

[9] The only other evidence on the matter came from Anderson, who testified that his only discussion with Casey or Herriage concerning the incident was that the Residents filed a lawsuit, they described the nature of the suit, and asked him to write down the relevant events as he could best recollect. Anderson indicated that they did not further discuss the matter.

[10] We note that the water treatment plant was in operation long before the Residents constructed their homes.

that flooding would be the result of any particular discharge. In other words, there is no evidence that all releases of water would necessarily flood the Residents' homes. *See City of Van Alstyne v. Young*, 146 S.W.3d 846, 850 (Tex. App.—Dallas 2004, no pet.) (holding no taking, even though City generally knew of occasional back-ups in sewer system, because there was no evidence City was aware of recurrent flooding that would have put it on notice that flooding of plaintiff's home was substantially certain to result from its decision not to replace pumps, and plaintiff never complained of prior flooding).

Second, the Residents point to the specific May 2015, December 2015, and March 2016 releases of water that form the basis of their suit as evidence that the City knew of the harm.[11] We have described the alleged causes of the May 2015 release in our analysis of the Residents' TTCA claim. With respect to the December 2015 release, the Residents claim in their petition that this release caused them harm, and that the City purposely released the water. But the evidence in the record shows that the parties agree that no one knows how or why this release occurred. With respect to the March 2016 release, none of the parties argue that this event harmed them. On the contrary, the only evidence with respect to this release in the record is Jamie Running's statement that the March 2016 release caused no harm. The intentional government act must have been the proximate cause of the damages in an inverse condemnation action. *See Hearts Bluff Game Ranch*, 381 S.W.3d at 483-84 (requiring intentional government act to proximately cause the damages). The record is devoid of evidence that any City employee knew that its authorized acts would cause flooding or that they were substantially certain to result in flooding of the Residents' homes. *See, e.g., Kerr*, 499 S.W.3d at 806-07; *Jennings*, 142 S.W.3d 310, 314–15.

Finally, when determining intent in the takings context, "[t]he government's knowledge must be determined as of the time it acted, not with [the] benefit of hindsight." *Kerr*, 499 S.W.3d at 806. Because (1) no one complained of any flooding prior to the May 2015 discharge (2) the cause of the December 2015 flooding event is unknown, (3) the March 2016 event caused no harm, (4) the December 2015 and March 2016 events occurred after the first flooding event in May 2015, and (5) the City's alleged knowledge of past discharges over the years are unaccompanied by any evidence of prior flooding, any knowledge of recurring floods to these properties can be attributed

---

[11] The record also shows that the area in question received historically high amounts of rainfall during that period.

11

to the City only with the benefit of hindsight, which is an improper consideration. *See **id.***
Accordingly, the City's third issue is sustained.

**INVERSE CONDEMNATION – U.S. CONSTITUTION**

The City contends in its fourth issue that the trial court should have granted its plea to the jurisdiction on the Residents' federal takings claim because it has been "subsumed" into their nonviable state inverse condemnation claim. We agree.

The Just Compensation Clause of the Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation." U.S. CONST. amend. V. Our case law on takings under the Texas Constitution is consistent with federal jurisprudence. *See **Hearts Bluff Game Ranch***, 381 S.W.3d at 477. Accordingly, we consider the federal and state takings claims together, as the analysis for both is complementary. *See, e.g., **City of Austin v. Travis Cnty. Landfill Co.***, 73 S.W.3d 234, 238–39 (Tex.2002); ***Mayhew v. Town of Sunnyvale***, 964 S.W.2d 922, 933-34 (Tex. 1998).

Specifically, flooding inverse condemnation cases under the Just Compensation Clause require reviewing courts to consider the government's intent to cause the damage or whether the damages were the "direct or necessary result" of authorized government action, which is substantially similar to Texas law. *See **Ark. Game & Fish Comm'n v. United States***, 568 U.S. 23, 38-39, 133 S. Ct. 511, 522-23, 184 L. Ed. 2d 417 (2012) (holding that in temporary flooding cases under Just Compensation Clause, relevant factors, among others, include government's intent or whether damages were foreseeable result of authorized government action, as well as the severity and frequency of the flooding events); ***Sanguinetti v. United States***, 264 U.S. 146, 149–50, 44 S. Ct. 264, 265, 68 L. Ed. 608 (1924) (holding no taking under Just Compensation Clause where landowner failed to provide any evidence that flooding was "direct or necessary result" of government action, and any amount of increased flooding caused by action was purely conjectural, where area had suffered from major natural flooding event and subsequent intermittent less severe flooding in later years).

When a federal takings claims is based on the same underlying facts as a nonviable state takings claim, the federal claim is "subsumed" into the state takings claim and is properly dismissed pursuant to a plea to the jurisdiction. *See **City of New Braunfels v. Carowest Land, Ltd.***, 432 S.W.3d 501, 517-18 (Tex. App.—Austin 2014, no pet.). Here, as we have stated, the

12

basis for the state and federal inverse condemnation claim is the same: the City's alleged negligence in failing to prevent an overflow from Clearwell No. 2 that flooded their property. Accordingly, because we have held that the state inverse condemnation claim is nonviable, the trial court should have granted the City's plea to the jurisdiction on the Residents' federal takings claim. *See id.* The City's fourth issue is sustained.

## DISPOSITION

Having sustained the City's four issues, we *reverse* the trial court's order denying the City's plea to the jurisdiction, and *dismiss* the Residents' suit against it for lack of subject matter jurisdiction. *See* TEX. R. APP. P. 43.2(c).

**JAMES T. WORTHEN**
Chief Justice

Opinion delivered February 14, 2019.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(PUBLISH)



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**FEBRUARY 14, 2019**

**NO. 12-18-00047-CV**

**PETER RUNNING, JAMIE RUNNING, AND CINDY WILKINS,
APPELLANTS/CROSS-APPELLEES,**
Appellants
V.
**THE CITY OF ATHENS, TEXAS AND ATHENS MUNICIPAL WATER AUTHORITY,
APPELLEES/CROSS-APPELLANTS,**
Appellees

Appeal from the 392nd District Court

of Henderson County, Texas (Tr.Ct.No. CV16-0028-392)

THIS CAUSE came to be heard on the oral arguments, appellate record and the briefs filed herein, and the same being considered, because it is the opinion of this court that the trial court's order denying the City of Athens' plea to the jurisdiction should be reversed and rendered, and the case dismissed.

It is therefore ORDERED, ADJUDGED and DECREED by this court that the trial court's order denying the City's plea to the jurisdiction be, and the same is, hereby **reversed** and judgment is **rendered dismissing** the cause **for lack of subject matter jurisdiction**. All costs in this cause expended in this court be, and the same are, hereby adjudged against **PETER RUNNING, JAMIE RUNNING, AND CINDY WILKINS, APPELLANTS/CROSS-APPELLEES,** for which let execution issue; and that this decision be certified to the court below for observance.

James T. Worthen, Chief Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*